RIZZO POOL COMPANY *v.* DANIEL DEL GROSSO ET AL.
(14973)
(14974)

PETERS, C. J., and CALLAHAN, BERDON, KATZ and PALMER, Js.

Argued November 1, 1994—decision released April 11, 1995

*Shelley M. Weiss,* for the appellants (defendants).

*David L. Gussak,* for the appellee (plaintiff).

PALMER, J. The principal issue raised by this appeal is whether a certain contract between the plaintiff, Rizzo Pool Company, and the defendants, Daniel Del Grosso and Jo-Ann Del Grosso, for the installation of a swimming pool on the defendants' property is subject to the provisions of the Home Improvement Act (HIA).[1] The plaintiff commenced this action for breach of contract when the defendants refused to allow the plaintiff to install the pool pursuant to the contract. The case was tried to a jury, which returned a verdict for the plaintiff. The trial court rendered judgment for the plaintiff in accordance with the jury verdict, and

[1] General Statutes § 20-418 et seq.

the defendants appealed.[2] We reverse in part the judgment of the trial court.

The record reveals the following facts. The defendants, a married couple who resided in New London, began construction of a new home on property that they owned in Waterford. In the spring of 1988, while their new home was under construction, the defendants contacted the plaintiff for information regarding the installation of a swimming pool on the Waterford site. The plaintiff's sales representative, James Keenan, made several visits to the defendants' Waterford property to take various measurements and to discuss the possible pool installation with the defendants. Because the defendants' property abutted a pond, one of the issues discussed by Keenan and the defendants was the effect of the water level of the pond on the cost of the pool construction.

On July 15, 1988, the parties signed a contract in the amount of $37,810 for the installation of a swimming pool at the defendants' new home.[3] The contract expressly provided that in the event of cancellation of the contract by the defendants, the plaintiff would be entitled to liquidated damages of 20 percent of the contract price, plus costs of collection and reasonable attorney's fees. Although the defendants anticipated that the pool would be installed prior to the completion date of their new home, the contract did not contain either a starting date or a completion date.

[2] The defendants appealed separately from the judgment of the trial court to the Appellate Court, which entered an order consolidating the appeals. We then transferred the appeals to this court pursuant to Practice Book § 4023 and General Statutes § 51-199 (c).

[3] On the same date, the plaintiff and Daniel Del Grosso also signed a contract for the construction of a concrete deck around the pool, and on October 20, 1988, they entered into a third agreement for the construction of a spa at the site of the pool. As used hereinafter in this opinion, the term "contract" includes all three agreements.

In October, 1988, the town of Waterford temporarily lowered the water level of the pond adjacent to the defendants' property. The plaintiff urged the defendants to authorize the immediate installation of the swimming pool in order to avoid an increase in the contract price once the water level of the pond was returned to normal.[4] The defendants, however, refused to allow the plaintiff to commence construction of the pool at that time.

In the spring of 1989, the defendants instructed the plaintiff to proceed with the installation of the swimming pool. The plaintiff agreed to do so, but informed the defendants that the price of the pool had increased by approximately $5000 due to the return to normal of the pond's water level.[5] The defendants, however, refused to allow the plaintiff to install the pool at a price higher than the contract price, claiming that the parties had not contemplated a price increase due to a change in the water level of the pond. The plaintiff then initiated this action for breach of contract, seeking damages, interest and attorney's fees.

The defendants filed an answer, a counterclaim and several special defenses. The defendants' counterclaim alleged, in three counts, that the plaintiff had: (1) fraudulently induced the defendants to agree to purchase the swimming pool by quoting them a contract price that the plaintiff knew to be lower than that required to construct the pool; (2) violated the Connect-

---

[4] The plaintiff claimed at trial that Keenan had explained to the defendants before they entered into the contract that the price of the swimming pool would increase if it was not installed prior to the return to normal of the pond's water level. The defendants testified that they had not been so advised. The plaintiff also maintains, and the defendants dispute, that the contract permitted an increase in the contract price due to the change in the pond's water level.

[5] The plaintiff also informed the defendants of an increase in the price of the pool due to an increase in the plaintiff's material costs from the date the contract was signed in July, 1988, to the spring of 1989.

icut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq., by virtue of its fraudulent misrepresentations regarding the price of the pool; and (3) breached the swimming pool installation contract. The defendants' special defenses claimed, inter alia, that the contract was an unenforceable "home improvement contract" under the HIA[6] because it failed to contain a commencement date or a completion date, or the signatures of both of the defendants as owners of the property.[7] The defendants moved for summary judg-

[6] General Statutes § 20-419 provides in relevant part: "DEFINITIONS. As used in this chapter, the following terms shall have the following meanings unless the context clearly denotes otherwise . . . .

"(4) 'Home improvement' includes, but is not limited to, the repair, replacement, remodeling, alteration, conversion, modernization, improvement, rehabilitation or sandblasting of, or addition to any land or building or that portion thereof which is used or designed to be used as a private residence, dwelling place or residential rental property, or the construction, replacement, installation or improvement of driveways, swimming pools, porches, garages, roofs, siding, insulation, solar energy systems, flooring, patios, landscaping, fences, doors and windows and waterproofing in connection with such land or building or that portion thereof which is used or designed to be used as a private residence, dwelling place or residential rental property, in which the total cash price for all work agreed upon between the contractor and owner exceeds two hundred dollars. 'Home improvement' does not include: (A) The construction of a new home; (B) the sale of goods by a seller who neither arranges to perform nor performs, directly or indirectly, any work or labor in connection with the installation or application of the goods or materials; (C) the sale of goods or services furnished for commercial or business use or for resale, provided commercial or business use does not include use as residential rental property; (D) the sale of appliances, such as stoves, refrigerators, freezers, room air conditioners and others which are designed for and are easily removable from the premises without material alteration thereof; (E) any work performed without compensation by the owner on his own private residence or residential rental property.

"(5) 'Home improvement contract' means an agreement between a contractor and an owner for the performance of a home improvement. . . ."

[7] General Statutes § 20-429 (a) provides: "No home improvement contract shall be valid or enforceable against an owner unless it: (1) Is in writing, (2) is signed by the owner and the contractor, (3) contains the entire agreement between the owner and the contractor, (4) contains the date of the transaction, (5) contains the name and address of the contractor,

ment on their special defenses under the HIA. The trial court, *Austin, J.*, denied the defendants' motion on the ground that the exemption under the HIA for new home construction[8] rendered the act inapplicable to the contract.[9]

The defendants thereafter filed certain additional special defenses, alleging that the swimming pool contract violated the provisions of the Home Solicitation Sales Act (HSSA).[10] Specifically, the defendants claimed that the notice of cancellation required by the HSSA was printed in smaller typeface than that mandated by the statute, that the cancellation notice did not contain a place where it could be signed and dated in accordance with the statutory requirements, and that the page of the contract containing the notice was not easily detachable from the other contract provisions.[11] The

(6) contains a notice of the owner's cancellation rights in accordance with the provisions of chapter 740, (7) contains a starting date and completion date, and (8) is entered into by a registered salesman or registered contractor. Each change in the terms and conditions of a contract shall be in writing and shall be signed by the owner and contractor, except that the commissioner may, by regulation, dispense with the necessity for complying with the requirement that each change in a home improvement contract shall be in writing and signed by the owner and contractor."

[8] See footnote 6.

[9] The trial court concluded that "[t]he legislature intended the Home Improvement Act to refer to improvements of existing dwellings, not to the construction of new homes. The home to which the pool in question was to be a part was not in existence at the time the contract was entered into. Further, the alleged facts state that it was contemplated that this pool would be built simultaneously with the building of the new home. Even though swimming pools are specifically included in the definition of home improvements, it is submitted that an illogical result would be reached if it is determined that this pool would be a home improvement to a home which did not exist."

[10] General Statutes § 42-134a et seq.

[11] General Statutes § 42-135a provides in relevant part: "NOTICE IN SALES AGREEMENT. NOTICE OF CANCELLATION. DUTIES OF SELLER. No agreement of the buyer in a home solicitation sale shall be effective if it is not signed and dated by the buyer or if the seller shall:

"(1) Fail to furnish the buyer with a fully completed receipt or copy of all contracts and documents pertaining to such sale at the time of its exe-

plaintiff filed a motion in limine seeking an order precluding the introduction at trial of any evidence relating to the special defenses asserted by the defend-

cution, which contract shall be in the same language as that principally used in the oral sales presentation and which shall show the date of the transaction and shall contain the name and address of the seller, and in immediate proximity to the space reserved in the contract for the signature of the buyer, or on the front page of the receipt if a contract is not used, and in boldface type of a minimum size of ten points, a statement in substantially the following form:

"YOU, THE BUYER, MAY CANCEL THIS TRANSACTION AT ANY TIME PRIOR TO MIDNIGHT OF THE THIRD BUSINESS DAY AFTER THE DATE OF THIS TRANSACTION. SEE THE ATTACHED NOTICE OF CANCELLATION FORM FOR AN EXPLANATION OF THIS RIGHT.

"(2) Fail to furnish each buyer, at the time he signs the home solicitation sales contract or otherwise agrees to buy consumer goods or services from the seller, a completed form in duplicate, captioned 'NOTICE OF CANCELLATION', which shall be attached to the contract or receipt and easily detachable, and which shall contain in ten-point boldface type the following information and statements in the same language as that used in the contract:

"NOTICE OF CANCELLATION

. . . . (Date of Transaction)

"YOU MAY CANCEL THIS TRANSACTION, WITHOUT ANY PENALTY OR OBLIGATION, WITHIN THREE BUSINESS DAYS FROM THE ABOVE DATE.

"IF YOU CANCEL, ANY PROPERTY TRADED IN, ANY PAYMENTS MADE BY YOU UNDER THE CONTRACT OR SALE, AND ANY NEGOTIABLE INSTRUMENT EXECUTED BY YOU WILL BE RETURNED WITHIN TEN BUSINESS DAYS FOLLOWING RECEIPT BY THE SELLER OF YOUR CANCELLATION NOTICE, AND ANY SECURITY INTEREST ARISING OUT OF THE TRANSACTION WILL BE CANCELLED.

"IF YOU CANCEL, YOU MUST MAKE AVAILABLE TO THE SELLER AT YOUR RESIDENCE, IN SUBSTANTIALLY AS GOOD CONDITION AS WHEN RECEIVED, ANY GOODS DELIVERED TO YOU UNDER THIS CONTRACT OR SALE; OR YOU MAY, IF YOU WISH, COMPLY WITH THE INSTRUCTIONS OF THE SELLER REGARDING THE RETURN SHIPMENT OF THE GOODS AT THE SELLER'S EXPENSE AND RISK.

"IF YOU DO MAKE THE GOODS AVAILABLE TO THE SELLER AND THE SELLER DOES NOT PICK THEM UP WITHIN TWENTY DAYS OF THE DATE OF CANCELLATION, YOU MAY RETAIN OR

ants under the HIA and the HSSA. Prior to the commencement of trial, the trial court, *R. O'Connell, J.*, granted the plaintiff's motion, concluding that the defendants' special defenses under the HIA were barred by Judge Austin's earlier determination, rendered in connection with his ruling on the defendants' motion for summary judgment, that the HIA was inapplicable to the contract,[12] and that the HSSA was also inapplicable to the contract on the ground that "[t]he purpose of the . . . [HSSA] does not fit the facts as the court has seen them and as they've been outlined . . . by the pleadings here."

At the close of the evidence,[13] the trial court granted the plaintiff's motion for a directed verdict on the fraud and CUTPA counts of the defendants' counterclaim, concluding, as to the first count, that the defendants had failed to adduce evidence sufficient to establish the plaintiff's fraud and, as to the second count, that the defendants had failed to introduce any evidence of an ascertainable loss of money or property as required under CUTPA.[14] The jury returned a verdict for the

DISPOSE OF THE GOODS WITHOUT ANY FURTHER OBLIGATION. IF YOU FAIL TO MAKE THE GOODS AVAILABLE TO THE SELLER, OR IF YOU AGREE TO RETURN THE GOODS TO THE SELLER AND FAIL TO DO SO, THEN YOU REMAIN LIABLE FOR PERFORMANCE OF ALL OBLIGATIONS UNDER THE CONTRACT.

"TO CANCEL THIS TRANSACTION, MAIL OR DELIVER A SIGNED AND DATED COPY OF THIS CANCELLATION NOTICE OR ANY OTHER WRITTEN NOTICE, OR SEND A TELEGRAM TO . . . . (Name of Seller) AT . . . . (Address of Seller's Place of Business) NOT LATER THAN MIDNIGHT OF . . . . (Date)

"I HEREBY CANCEL THIS TRANSACTION.

". . . . (Date)

     . . . . (Buyer's Signature). . . ."

[12] The trial court reasoned that Judge Austin's determination as to the inapplicability of the HIA to the contract represented the law of the case.

[13] Daniel Del Grosso represented himself at trial; Jo-Ann Del Grosso was represented by counsel.

[14] The trial court instructed the jury that it was not to consider the fraud count because the court had determined that "there was insufficient evi-

plaintiff on its complaint in the total amount of $26,292.80, awarding the plaintiff $7562 in damages, $3250.80 in interest, and $15,480 in attorney's fees. The jury also returned a verdict for the plaintiff on the third count of the defendants' counterclaim. This appeal followed.

On appeal, the defendants claim that the trial court improperly: (1) precluded them from establishing their special defenses under the HIA and the HSSA; (2) directed a verdict for the plaintiff on the fraud and CUTPA counts of their counterclaim; (3) failed to instruct the jury as to the essential factual allegations of the third count of their counterclaim for breach of contract; and (4) permitted counsel for the plaintiff to make inflammatory and prejudicial comments about Daniel Del Grosso during the trial.[15] We agree with the first claim and, accordingly, we reverse in part the judgment of the trial court.

I

The defendants first contend that the trial court improperly prohibited them from asserting their special defenses under the HIA and the HSSA on the ground that neither act was applicable to the parties'

dence for any jury possibly to find clear and convincing evidence of fraud in connection with that count." The trial court likewise directed the jury to disregard the defendants' claim under CUTPA because the court had "found no evidence that the defendants suffered any ascertainable loss of money or property" as a result of an unfair or deceptive act or practice. These instructions are tantamount to a directed verdict; see *Collette* v. *Piela*, 141 Conn. 382, 385, 106 A.2d 473 (1954); *McWilliams* v. *American Fidelity Co.*, 140 Conn. 572, 575, 102 A.2d 345 (1954); and we therefore treat them as such.

[15] The defendants also contend that the trial court improperly permitted the jury to award attorney's fees to the plaintiff in excess of 15 percent of the amount of the judgment. See General Statutes § 42-150aa. Because we conclude that the defendants were entitled to a directed verdict on the plaintiff's breach of contract claim; see part I of this opinion; we need not reach that issue.

contract. We agree with the defendants and, for the reasons that follow, we conclude that the trial court should have directed a verdict in their favor on the complaint.

A

A contract is subject to the requirements of the HIA if it constitutes "an agreement between a contractor and an owner for the performance of a home improvement." General Statutes § 20-419 (5). Under the HIA, "home improvement" includes, among other things, the construction, replacement, installation or improvement of a swimming pool in connection with any land or building used or designed to be used as a private residence. General Statutes § 20-419 (4).[16] Among the activities expressly excluded from the definition of "home improvement," however, is "[t]he construction of a new home." General Statutes § 20-419 (4) (A). The trial court concluded that the parties' contract was exempt from the requirements of the HIA because the pool was to be installed in conjunction with the construction of the defendants' new home.

In construing the HIA, "[o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In seeking to discern that intent, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter." (Citations omitted; internal quotation marks omitted.) *State* v. *Metz*, 230 Conn. 400, 409, 645 A.2d 965 (1994); *Fleming* v. *Garnett*, 231

---

[16] In addition, the total cash price for all work agreed upon between the contractor and the owner must exceed $200 for the agreement to constitute a "home improvement contract" under the HIA. General Statutes § 20-419 (4).

Conn. 77, 91–92, 646 A.2d 1308 (1994). Application of these well established principles of statutory construction persuades us that the parties' pool installation contract is subject to the requirements of the HIA.

Our starting point is the broad language of § 20-419 (4), which defines "home improvement" to include the installation of a swimming pool for use at a private residence. Although construction of the defendants' new home had not been completed at the time the parties contracted for the installation of the pool, it is undisputed that the new dwelling was designed and intended for use as the defendants' private residence. Thus, the pool to be constructed by the plaintiff constituted a "home improvement" as defined by § 20-419 (4) unless its installation represented "[t]he construction of a new home" under § 20-419 (4) (A).[17]

In the circumstances of this case, we conclude that the planned pool installation was not a part of "[t]he construction of a new home." The pool installation contract was completely separate and distinct from the defendants' home construction contract, and the two contracts were to be performed by entirely different and unrelated contractors. Moreover, the documents that comprise the contract for the construction of the swimming pool contain no indication that the pool was

---

[17] The plaintiff argues, and the trial court concluded; see footnote 9; that the improvement to the defendants' property contemplated by the parties' swimming pool contract cannot constitute a "home improvement" under the HIA because the construction of the defendants' new home had not been completed when the contract was signed. We do not agree that an improvement is exempt from the requirements of the HIA solely because the construction of the home to which the improvement is contemplated has not been completed. In circumstances where, as here, the new home construction had already commenced by the date on which the contract for the installation of the improvement was signed, it would be contrary to the remedial purpose of the HIA to deprive the consumer of the otherwise applicable protections of the act. See *Habetz* v. *Condon*, 224 Conn. 231, 239, 618 A.2d 501 (1992); *Barrett Builders* v. *Miller*, 215 Conn. 316, 323, 576 A.2d 455 (1990).

to have been installed at any particular stage of the new home construction, or even that it was to have been installed prior to the completion of the new home.[18] In fact, the contract documents make no reference whatsoever to the construction of the defendants' new home. Thus, although the defendants anticipated that the swimming pool would be installed prior to the completion of their new home, the record does not support the conclusion that the swimming pool installation and the new home construction were so interrelated, temporally or otherwise, that the installation of the pool constituted an integral part of "[t]he construction of a new home" under § 20-419 (4) (A).[19]

Our conclusion also finds support both in the legislative history of the HIA and in the policy that its passage was intended to implement. As we have previously noted, the HIA " 'was passed for the protection of the public.' " *Barrett Builders* v. *Miller*, 215 Conn. 316, 323, 576 A.2d 455 (1990), quoting *Caulkins* v. *Petrillo*, 200 Conn. 713, 720, 513 A.2d 43 (1986). "The objective of the [HIA] is to promote understanding by the consumer, to ensure his ability to make an informed decision and to protect him from substantial work by an unscrupulous contractor. 22 S. Proc., Pt. 17, 1979 Sess., p. 5797, remarks of Senator Audrey P. Beck." *Habetz* v. *Condon*, 224 Conn. 231, 239, 618 A.2d 501 (1992). As remedial legislation, the HIA must be afforded a liberal construction in favor of those whom the legislature intended to benefit. *Barrett Builders* v. *Miller*, supra, 323. In the circumstances presented, the defendants, as consumers who entered into an agree-

---

[18] Indeed, the defendants contend that the parties' agreement violated the HIA in part because the contract contained no commencement date and no completion date.

[19] We acknowledge that a different conclusion might be required if the swimming pool was to have been installed by the general contractor, or a subcontractor hired by the general contractor, under the contract for the construction of the new home.

ment with a home improvement contractor for the installation of a swimming pool, are members of the class that the legislature sought to protect by passage of the HIA.

The applicability of the HIA to the parties' contract is further supported by the relationship between the HIA and chapter 827 of the General Statutes, §§ 47-116 through 47-121, entitled "New Home Warranties." Chapter 827 protects purchasers of new single-family homes by creating certain express and implied warranties of sale in their favor. General Statutes §§ 47-117 and 47-118. Thus, if the defendants had chosen to have the swimming pool installed by their new home builder as part of the contract for the construction of their new home, the installation of the pool presumably would have been subject to the warranties established by §§ 47-117 and 47-118. See General Statutes § 47-116;[20] see also *Krawiec* v. *Blake Manor Development Corp.*, 26 Conn. App. 601, 605–606, 602 A.2d 1062 (1992) (warranties created under chapter 827 not limited to structure of dwelling unit itself). In the circumstances presented, however, the defendants would not have been entitled to the protection of the warranties created by §§ 47-117 and 47-118, because the swimming pool was not a fixture or structure that had been "made a part [of the single-family dwelling unit] at the time of construction" by the general contractor or a subcon-

---

[20] General Statutes § 47-116 provides: "DEFINITIONS. As used in [chapter 827], unless the context otherwise requires: 'Improvement' means any newly constructed single family dwelling unit, any conversion condominium unit being conveyed by the declarant and any fixture or structure which is made a part thereof at the time of construction or conversion by any building contractor, subcontractor or declarant; 'purchaser' means the original buyer, his heirs or designated representatives, of any improved real estate; 'real estate' means any fee simple estate; and 'vendor' means any person engaged in the business of erecting or creating an improvement on real estate, any declarant of a conversion condominium, or any person to whom a completed improvement has been granted for resale in the course of his business."

tractor. General Statutes § 47-116; see footnote 20. In view of the broad statutory safeguards afforded consumers who have contracted to purchase new homes and consumers who have contracted for home improvements, we see no reason to deprive the defendants of any such protection merely because they sought to have a swimming pool installed by a home improvement contractor at the site of their new home construction. We conclude, therefore, that the HIA is applicable to the parties' contract.[21]

## B

The plaintiff concedes that its contract with the defendants does not contain a commencement or a completion date. Because the requirements of the HIA are mandatory and must be strictly construed, the absence of these dates constitutes a violation of the HIA that renders the contract unenforceable. *Barrett Builders* v. *Miller*, supra, 215 Conn. 321–22; *Caulkins* v. *Petrillo*, supra, 200 Conn. 717–18. Thus, the plaintiff is precluded from recovery against the defendants unless the plaintiff can establish that the defendants' invocation of the HIA as the basis for their repudiation of the contract was in bad faith.[22] See *Habetz* v. *Condon*, supra, 224 Conn. 238; *Barrett Builders* v. *Miller*, supra, 328.

---

[21] The defendants also claim that the trial court improperly concluded that the HSSA did not apply to the parties' contract. Because we have determined that the parties' agreement constitutes a "home improvement contract" under the HIA, the contract also is subject to the requirements of the HSSA. See General Statutes § 20-429 (e) ("[e]ach home improvement contract entered into shall be considered a home solicitation sale pursuant to [the HSSA] and shall be subject to the requirements of said [act] regardless of the location of the transaction or of the signing of the contract"); see also *A. Secondino & Son, Inc.* v. *LoRicco*, 215 Conn. 336, 343–44 n.10, 576 A.2d 464 (1990). In view of our conclusion that the defendants' special defense under the HIA entitles them to judgment on the complaint, further consideration of the defendants' special defense under the HSSA is unnecessary.

[22] "[A] homeowner cannot in bad faith invoke the contractor's [HIA] violation as a basis for his own repudiation of the contract." *Habetz* v. *Con-*

Although the plaintiff raised in the trial court the claim that the defendants had invoked the HIA in bad faith,[23] the plaintiff had no occasion to establish the claim in view of the court's conclusion that the HIA did not apply to the parties' contract. Ordinarily, a new trial would be required to afford the plaintiff the opportunity to prove that the defendants repudiated the contract in bad faith. The bad faith exception, however, is intended to preclude a homeowner from unfairly invoking the HIA "[t]o deny the contractor any opportunity of recovery after he has completed his end of the bargain . . . ." *Habetz* v. *Condon*, supra, 224 Conn. 240. In this case, installation of the swimming pool was never commenced and, consequently, the plaintiff is not entitled to restitutionary relief based on a theory of quasi contract, quantum meruit or unjust enrichment.[24] See id., 236 n.9; *Barrett Builders* v. *Miller*, supra, 215 Conn. 317 n.1. Because the bad faith exception may not be used by a contractor to recover on a restitutionary

*don*, supra, 224 Conn. 236 n.10; see also *Wadia Enterprises, Inc.* v. *Hirschfeld*, 224 Conn. 240, 247–48, 618 A.2d 506 (1992); *Sidney* v. *DeVries*, 215 Conn. 350, 354, 575 A.2d 228 (1990); *Liljedahl Bros., Inc.* v. *Grigsby*, 215 Conn. 345, 350, 576 A.2d 149 (1990); *A. Secondino & Son, Inc.* v. *LoRicco*, 215 Conn. 336, 340, 576 A.2d 464 (1990); *Barrett Builders* v. *Miller*, supra, 215 Conn. 328. "We [have] defined bad faith as involving actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive. . . . In other words, bad faith means more than mere negligence; it involves a dishonest purpose." (Citations omitted; internal quotation marks omitted.) *Wadia Enterprises, Inc.* v. *Hirschfeld*, supra, 248; *Habetz* v. *Condon*, supra, 237.

[23] Specifically, the plaintiff alleged that the swimming pool contract contained neither a commencement date nor a completion date because the defendants insisted upon a sufficiently flexible pool installation schedule to allow for the coordination of the pool construction and the new home construction based upon the progress of the latter. The plaintiff further claimed that the defendants failed to coordinate the two projects as promised.

[24] The plaintiff therefore sought recovery only under the liquidated damages provision of the parties' agreement.

theory when, as here, the contractor has not performed any of the home improvement services contemplated by the contract, the plaintiff cannot recover even if it can establish that the defendants repudiated the contract in bad faith. Accordingly, the defendants, having established a special defense under the HIA, are entitled to judgment on the complaint.

## II

The defendants also claim that the trial court improperly directed a verdict for the plaintiff on the fraud and CUTPA counts of their counterclaim. We disagree.

## A

The first count of the counterclaim alleged that the plaintiff's sales representative, Keenan, had fraudulently induced the defendants to enter into the swimming pool installation contract. We agree with the trial court that the plaintiff was entitled to a directed verdict on this count, but for a different reason than that propounded by the trial court.[25]

[25] The trial court directed a verdict for the plaintiff on the ground that the evidence was insufficient for the jury to find clear and convincing evidence of fraudulent conduct by the plaintiff. See footnote 14. The record, however, discloses the following testimony by Daniel Del Grosso in support of the defendants' claim. Keenan visited the proposed site of the swimming pool on two occasions prior to the execution of the contract, and on both occasions the pond was at its normal high water level. On the second visit to the site, Keenan and an assistant, who were unaware that the town planned to lower temporarily the level of the water in the pond, took various measurements of the pond and the property. Upon completing the measurements, Keenan told the defendants that the pond's water level "was not a problem." According to Del Grosso, it was not until some time after the defendants had signed the pool installation contract that Keenan informed them that there would be an increase in the price of the pool if it was not installed prior to the return to normal of the pond's water level. Viewed in the light most favorable to the defendants; see *Berry* v. *Loiseau*, 223 Conn. 786, 820, 614 A.2d 414 (1992); this testimony supports the claim that Keenan, in order to induce the defendants to sign the contract, intentionally misled them to believe that the water level of the pond would have no bearing on the price of the pool. Although the evidence adduced by the

"The essential elements of an action in fraud, as we have repeatedly held, are: (1) that a false representation was made as a statement of fact; (2) that it was untrue and known to be untrue by the party making it; (3) that it was made to induce the other party to act on it; and (4) that the latter did so act on it to his injury. . . ." (Internal quotation marks omitted.) *Maturo* v. *Gerard*, 196 Conn. 584, 587, 494 A.2d 1199 (1985).[26] With respect to the last element, "[a] plaintiff who has not suffered damage or injury cannot pursue an action at law or in equity for nominal damages resulting from fraudulent actions." *Kilduff* v. *Adams, Inc.*, 219 Conn. 314, 329, 593 A.2d 478 (1991); see also *Beik* v. *Thorsen*, 169 Conn. 593, 594–95, 363 A.2d 1030 (1975).

In directing a verdict against the defendants on the CUTPA count of their counterclaim, the trial court concluded that the defendants had failed to present any evidence of loss or harm resulting from the actions of the plaintiff. See footnote 14. We have carefully reviewed the record and concur with the trial court that there is no evidence that the defendants suffered any injury due to the plaintiff's alleged fraudulent misconduct.[27] For that reason, the plaintiff was entitled to a directed verdict on the fraud count of the counterclaim.

plaintiff sharply contradicted the defendants' claim of fraud, "[i]t is uniquely the province of the trier of fact, in this case the jury, to determine the import of the evidence by gauging the credibility of the witnesses." Id., 821. Thus, Del Grosso's testimony concerning Keenan's alleged intentional misrepresentations raised questions of fact requiring resolution by the jury. Because, however, we conclude that the defendants failed to establish that they were harmed by the plaintiff's alleged misconduct, the plaintiff was entitled to a directed verdict on the fraud count of the defendants' counterclaim.

[26] "We have held that a misrepresentation made without belief in its truth or recklessly made can also provide the basis for a fraud claim. *Clark* v. *Haggard*, 141 Conn. 668, 673, 109 A.2d 358 (1954)." *Kilduff* v. *Adams, Inc.*, 219 Conn. 314, 329 n.15, 593 A.2d 478 (1991).

[27] The defendants assert on appeal that the plaintiff's alleged fraudulent conduct deprived them of the opportunity to have a swimming pool con-

## B

The second count of the defendants' counterclaim alleged that the plaintiff's misrepresentations regarding the effect of the water level of the pond on the price of the swimming pool constituted an unfair or deceptive trade practice under CUTPA. As we have discussed, the trial court concluded that the defendants had presented no evidence that they had suffered an ascertainable loss of money or property,[28] and, accordingly, directed a verdict for the plaintiff on the defendants' CUTPA claim. The defendants contend, however, that they were improperly precluded from introducing evidence to establish damages under CUTPA. Specifically, they claim that the trial court should have permitted certain proffered testimony by Daniel Del Grosso, which the court excluded upon objection by the plaintiff's counsel on foundation grounds, regarding attorney's fees that the defendants allegedly had incurred after the plaintiff had commenced this action against them and in defense thereof.

structed at the contract price agreed upon by the parties. The defendants introduced no evidence, however, to establish that they could not find another contractor to install the pool for a price equal to or less than the contract price. The defendants claim no other damage resulting from the fraud allegedly perpetrated by the plaintiff.

[28] "A party seeking to recover damages under CUTPA must meet two threshold requirements. First, he must establish that the conduct at issue constitutes an unfair or deceptive trade practice. *Web Press Services Corporation* v. *New London Motors, Inc.*, 205 Conn. 479, 481–84, 533 A.2d 1211 (1987); *Conaway* v. *Prestia*, 191 Conn. 484, 492–93, 464 A.2d 847 (1983). Second, he must present evidence providing the court with a basis for a reasonable estimate of the damages suffered. *Barco Auto Leasing Corporation* v. *House*, 202 Conn. 106, 120–21, 520 A.2d 162 (1987); *Conaway* v. *Prestia*, supra, 494; *Hinchliffe* v. *American Motors Corporation*, 184 Conn. 607, 619, 440 A.2d 810 (1981)." *A. Secondino & Son, Inc.* v. *LoRicco*, 215 Conn. 336, 343, 576 A.2d 464 (1990); see also General Statutes § 42-110g (a) ("[a]ny person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a [prohibited] method, act or practice . . . may bring an action . . . to recover actual damages").

Although it is doubtful that the defendants would have been able to establish that the attorney's fees they incurred in defending the plaintiff's action constituted damages recoverable under General Statutes § 42-110g (a); see footnote 28; the defendants neither objected to the trial court's ruling on the proffered evidence nor otherwise sought to explain why it was admissible.[29] Accordingly, we refuse to consider the defendants' evidentiary claim. See *Berger* v. *Cuomo*, 230 Conn. 1, 11–12, 644 A.2d 333 (1994); *State* v. *Brice*, 186 Conn. 449, 457, 442 A.2d 906 (1982). Because the defendants have raised no other claim regarding the sufficiency of the evidence of any ascertainable loss under § 42-110g (a),[30] they are not entitled to relief on the CUTPA count of their counterclaim.

## III

The defendants next contend that they are entitled to a new trial on their breach of contract claim because the trial court failed to explain the essential factual allegations of the claim in its instructions to the jury. We do not agree.

The breach of contract count of the defendants' counterclaim contained nine numbered paragraphs, the first eight of which set forth the facts alleged by the defendants to support the claim. Although the trial court instructed the jury on the law regarding the breach of contract claim, the court failed to read, summarize or otherwise explain to the jury the factual allegations underlying the claim.

[29] Moreover, the defendants did not seek to introduce any other evidence to establish their payment of attorney's fees.

[30] The defendants have not claimed that they suffered an ascertainable loss under CUTPA by virtue of the fact that the plaintiff's failure to install the swimming pool deprived them of the benefit of their bargain. See *Hinchliffe* v. *American Motors Corp.*, 184 Conn. 607, 614, 440 A.2d 810 (1981). Because that issue is not before us, we do not consider it.

We agree with the defendants that they were entitled to an instruction that more fully apprised the jury of the nature of their action for breach of contract. The defendants, however, never requested that the trial court read or explain to the jury the pertinent factual allegations, nor did they request that the pleadings be made available to the jury.[31] Moreover, neither of the defendants excepted to the trial court's instructions on the counterclaim. "Section 315 [of the Practice Book] provides that this court is not bound to review claims of error in jury instructions if the party raising the claim did not either submit to the trial court a written request to charge or promptly except to the charge after it was delivered. . . . The purpose of the rule is to alert the court to claims of error while there is still an opportunity for correction in order to avoid the economic waste and increased court congestion caused by unnecessary retrials." (Internal quotation marks omitted.) *Berry* v. *Loiseau*, 223 Conn. 786, 814, 614 A.2d 414 (1992). Because the defendants failed to bring this issue to the attention of the trial court, we decline to consider the claim.

IV

The defendants further contend that they are entitled to a new trial on the basis of certain inflammatory comments made by the plaintiff's counsel about Daniel Del Grosso in the presence of the jury.[32] The defendants contend that these remarks, especially those made during counsel's rebuttal to Del Grosso's closing argument,[33] were so repeated and flagrant that the trial

---

[31] The record reflects that the trial court, upon concluding the jury charge, told the clerk that the pleadings were not to be sent into the jury deliberation room. The defendants raised no objection to the trial court's instruction to the clerk.

[32] In view of our disposition of the defendants' other claims, a new trial would be required only on the defendants' breach of contract claim.

[33] For example, in his rebuttal to Daniel Del Grosso's closing argument, counsel for the plaintiff told the jury that "I have over thirty years heard

court should have acted, sua sponte, to prevent the remarks and to minimize the prejudice resulting therefrom. We are not persuaded that a new trial is warranted.

Although the defendants now claim that opposing counsel's conduct was so egregious as to require a new trial, the defendants themselves failed to object to all but one of the comments that they contend were objectionable.[34] Moreover, they interposed no objection whatsoever to counsel's closing argument to the jury, they failed to seek a mistrial on account of counsel's comments, and they failed to raise the issue of counsel's improper remarks in their posttrial motion to set aside the judgment.

We, of course, do not condone comments by counsel that go beyond the bounds of forceful advocacy. As we have previously observed, however, the trial court was in the best position to assess the possible prejudice, if any, that may have resulted from counsel's comments, and to fashion an appropriate remedy from a range of possible alternatives. See *Pisel* v. *Stamford Hospital*, 180 Conn. 314, 322, 430 A.2d 1 (1980); *Marko* v. *Stop & Shop, Inc.*, 169 Conn. 550, 559, 364 A.2d 217 (1975); *Butler* v. *Steck*, 146 Conn. 114, 119, 148 A.2d 246 (1959); see also *Yeske* v. *Avon Old Farms School, Inc.*,

many arguments by many people, both in and out of courtrooms. I've never heard one which is a combination of such sleaze, slime and innuendo as the one that I just was unfortunately victimized into listening to." Later in his rebuttal argument, counsel stated that Del Grosso had resorted to the use of "weasel words" during his testimony, a characterization for which the trial court had earlier admonished him. The record of the trial proceedings contains several other inappropriate, albeit less provocative, comments by the plaintiff's counsel.

[34] On the one occasion that the defendants did object to the remarks of the plaintiff's counsel, the trial court promptly cautioned him. Furthermore, the record reveals at least two other instances when the trial court admonished the plaintiff's counsel for his remarks even though no objection to those comments had been made.

1 Conn. App. 195, 204–205, 470 A.2d 705 (1984). The defendants were obliged, therefore, to raise in the trial court their objections to counsel's improper remarks. Because they failed to do so, the defendants are entitled to a new trial only if they can demonstrate that such relief is necessary to remedy a manifest injustice. See *Hennessy* v. *Metropolitan Life Ins. Co.*, 74 Conn. 699, 710, 52 A. 490 (1902). We are not persuaded that the defendants have met this burden.

At worst, any prejudice stemming from counsel's comments was minimal. The issues were closely contested by both sides, and the defendants themselves vigorously pursued their claim that the plaintiff had engaged in fraud and deception. In addition, the factual issues were not complicated, and there is little risk that counsel's objectionable remarks created undue confusion in the minds of the jurors. Moreover, the comments were neither so frequent nor so outrageous that they inevitably influenced the jury and, finally, any possible harm to the defendants likely was eliminated by the trial court's clear and emphatic charge to the jury that its verdict was to be based solely on the evidence and not on the remarks of counsel.[35] Accordingly, the

---

[35] The court instructed the jury that "you may not go outside the evidence to find facts nor resort to guess work or conjecture. Sympathy for or prejudice against either party has no place in this case and should not influence your deliberations in any way. . . . You must apply the law as I put it to you to the facts that you find proved. You are to accept the law from the Court without regard to any claims which have been made by counsel . . . .

\* \* \*

"The arguments that you just heard from counsel, the opening arguments, the objections, the speeches that I think to some degree, all of them have made, prior to asking a question, any [colloquy] or conversation between the lawyers, none of that is evidence. The only evidence upon which you are to decide the case is testimony that you heard on the witness stand and the exhibits which will be given to you and brought into the jury deliberation room for you, but the objections, the remarks that may have been made, there have been a few in this case, all of that, none of that is evidence upon which you should decide this case."

defendants have not demonstrated that they are entitled to a new trial due to the inappropriate remarks of the plaintiff's counsel.

The judgment is reversed with respect to the complaint and the case is remanded with direction to render judgment thereon for the defendants; the judgment is affirmed with respect to the counterclaim.

In this opinion the other justices concurred.

BERDON, J., concurring. I join the court's decision. I write separately only because of my concern that the court's discussion of "ascertainable loss" under the Connecticut Unfair Trade Practices Act (CUTPA)[1] may be misconstrued as requiring a CUTPA claimant to prove actual damages.

The requirement that there be an " 'ascertainable loss of money or property' " does not require the claimant "to prove a specific amount of actual damages in order to make out a prima facie case." *Hinchliffe* v. *American Motors Corp.*, 184 Conn. 607, 612–13, 440 A.2d 810 (1981). On the contrary, we have said that CUTPA claimants "are not required to prove actual damages of a specific dollar amount. . . . Whenever a consumer has received something other than what he bargained for, he has suffered a loss of money or property. That loss is ascertainable if it is measurable even though the precise amount of the loss is not known." Id., 613–14.

This language makes clear that if, because of an unfair or deceptive trade practice, a person has been deprived of the item for which he had bargained, he or she has suffered an "ascertainable loss" cognizable under CUTPA. Without showing more, that person is entitled to nominal damages. See *Larsen Chelsey Realty*

[1] General Statutes § 42-110a et seq.; see part II B of the majority opinion.

*Co.* v. *Larsen*, 232 Conn. 480, 497, 656 A.2d 1009 (1995). Of course, a person seeking damages in excess of purely nominal damages must prove the amount of those actual damages. *A. Secondino & Son, Inc.* v. *LoRicco*, 215 Conn. 336, 343, 576 A.2d 464 (1990).

The award of nominal damages under CUTPA opens the door to other important remedies. "[T]he plaintiff who establishes CUTPA liability has access to a remedy far more comprehensive than the simple damages recoverable under common law. . . . This remedy is not limited to mere compensatory damages. *Gill* v. *Petrazzuoli Bros., Inc.*, 10 Conn. App. 22, 34–35, 521 A.2d 212 (1987). Rather, under CUTPA, a plaintiff is entitled to have the trial court consider awarding both punitive damages; General Statutes § 42-110g (a); and attorney's fees. General Statutes § 42-110g (d); see *Hinchliffe* v. *American Motors Corp.*, supra, [184 Conn.] 617–18." (Citation omitted; internal quotation marks omitted.) *Larsen Chelsey Realty Co.* v. *Larsen*, supra, 232 Conn. 509–10. In addition, CUTPA allows a person who has not suffered actual damages to pursue equitable relief. See General Statutes § 42-110g (d).

In this case, the plaintiff's failure to install the swimming pool deprived the defendants of the item for which they had bargained—the swimming pool. The loss of the pool, therefore, was a sufficient "ascertainable loss" to allow them to proceed under CUTPA. See *Hinchliffe* v. *American Motors Corp.*, supra, 184 Conn. 614. Nevertheless, the defendants never argued before the trial court or this court that their loss of the swimming pool was a sufficient ascertainable loss under CUTPA. Instead, they focused only on actual damages, which, as the majority notes, they failed to prove. The plaintiffs, therefore, failed to make out a prima facie case under CUTPA. Accordingly, I concur in the result.