[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
CT Page 10802
The plaintiffs, Orlando Amato and Nancy Amato have brought suit against the defendants Sherwood Forest, Inc. and Mitchell Keszycki alleging that the home the defendants built for them was defective and that the defendants violated warranties created by the new home warranty act, General Statutes §§ 47-117 and47-118 and the Connecticut Unfair Trade Practices Act, General Statutes § 42-110b et seq.
Specifically, the plaintiffs claim in their complaint that the new home the defendants constructed at 267 Briarwood Drive in Guilford, Connecticut had the following defects in workmanship which the defendants have failed to correct:
 1. the main carrying beam for the second floor was not installed in accordance with the plans and specifications, standards of good workmanship, and the building code (Counts 1, 2, 3)
 2. the garage doors were not supplied and installed in accordance with the contract and specifications (Count 1)
 3. the subflooring was not screwed to floor joists in accordance with the contract and specifications (Count 1)
 4. the sizes of framing lumber specified in the contract were not used throughout the house (Count 1)
 5. interior doors were not installed in a workmanlike manner, resulting in difficulties in opening and closing them (Count 2)
 6. rafters and beams were not constructed according to sound engineering standards nor in a workmanlike manner or were not in accordance with the building code, and they lack adequate support in various areas (Counts 2, 3)
 7. the clothes dryer was improperly vented to the inside of the house, in violation of the building code (Count 2, 3)
 8. the chimney or roof around the chimney was not constructed according to sound engineering standards, or not constructed in a workmanlike manner, resulting in constant water leaks around the chimney, which has caused damage to other areas in the house (Count 2) CT Page 10803
 9. the roof and walls were improperly nailed resulting in numerous "nail pops" in the roof and throughout the interior of the house (Count 2)
 10. the heating system was not constructed according to sound engineering standards or in a workmanlike manner (Count 2)
 11. the hardwood flooring on the second floor was constructed from faulty materials or not in a workmanlike manner (Count 2)
 12. The garage was constructed out of plumb (Count 2)
The plaintiffs further claim that the defendants agreed to perform changes or repairs set forth on a "punch list" and that they failed to do so. (Count 4)
In the fifth count of their complaint, the plaintiffs allege that defendant Keszycki made false representations to them about his competence and experience.
In the sixth count, the plaintiffs allege that the defendants used inferior materials, required extra payments for items that the plaintiffs had not ordered, misrepresented the price of extra items, failed to conform to the plans and specifications, and induced the plaintiffs to pay the balance of the purchase price by agreeing to complete a "punch list" that they did not complete. The plaintiffs characterize these acts as violations of CUTPA.
In the seventh count of the complaint the plaintiffs allege no further causes of action but allege that they suffered health problems as a result of the alleged improper installment of the heating system.
The defendants have asserted no special defenses.
The court finds the facts to be as follows.
Defendant Keszycki, who is now seventy-two years of age, has been engaged as a carpenter and contractor for many years. In the spring of 1991 the plaintiffs became interested in houses that he was constructing one by one on lots he owned in Guilford. They advised him they wished to build a Litchfield Colonial, and at his suggestion they obtained pattern blueprints. Because the CT Page 10804 plaintiffs were not able to afford the cost of the house as depicted in the pattern blueprints, they asked Mr. Keszycki to suggest ways of bringing down the costs by eliminating some features set forth in the pattern plans.
Specifically, the plaintiffs requested that the house as built should be twenty-seven feet wide, not twenty-eight, that the rear dormers be omitted, and that many features of the house as depicted on the plans be left unfinished as the plaintiffs intended either to do that work themselves or to defer it until a future time when they could afford to complete the house.
The plaintiffs also requested that the builder change many features of the plans, including relocating rooms, eliminating dormers and skylights, and leaving decks unbuilt. Because of the topography of the lot which they were purchasing from the defendants as the site of their new home, they agreed that the house should be built as a mirror image of the plans, such that rooms on the left side of the plans would be on the right side of the house as built. The plaintiffs agreed that the contract price would not include painting.
The plaintiffs asked that the builder not build the garage as depicted In the pattern plans but that he instead build a three car garage with a steel beam rather than lolly column supports, and that the garage be built to allow for future living space above the car bays. This description of the garage was not made the subject either of a blueprint or detailed written specifications.
After discussing the project, the parties entered into a written agreement titled Real Estate Agreement (Exhibit A). That agreement was signed by Mitchell Keszycki individually and by both of the plaintiffs. While the agreement contains a signature line for Sherwood Forest, Inc., no signature appears on that line, and the court finds that the contract to build the house was therefore solely between the plaintiffs and Mitchell Keszycki, (hereinafter "builder") and that the corporate defendant was not a party to the agreement to build the house and is not therefore legally responsible for the fulfillment of any of its provisions.
The text of the real estate agreement provides that in return for payment of $281,368.00, the builder would provide a lot comprising approximately two acres and build a house on it "substantially in accordance with plans (Plan HD-125-84 by CT Page 10805 Stanwood Dolph) and specifications as more particularly described in Schedule A attached hereto, which dwelling shall be a two (2) story Litchfield Colonial Home."
The agreement further provides that any extras or changes requested by the buyers be made in writing and at a price to be agreed upon in writing by the buyer and the builder.
The only list of specifications introduced in evidence are set forth in Schedule A attached to the Agreement. These specifications will be referred to in connection with the various claimed defects in construction.
During the course of construction, the plaintiffs requested a great number of changes and extras, and friction arose in part because of their ambition to add to the features of the house without experiencing extra expense. Because the requested changes were neither reduced to blueprints nor detailed in the specifications, many details became a matter of interpretation.
With regard to many of the defects claimed in the complaint, the plaintiffs either failed to present testimony of any witness familiar with standards of workmanship or construction or failed to present any evidence sufficient to allow an estimation of damages. Only the claims that do not suffer from either of these failures of proof are therefore addressed by the court.
1. Garage.
The plaintiff's object that the builder installed eight-foot wide doors and not nine foot wide doors. Since the parties agreed that the garage should be a different structure than that depicted in the pattern plans, the court looks to the specifications, Schedule A, to determine whether the defendant failed to build in accordance with the parties' agreement. That document does not specify the width of the doors. Mr. Amato visited the construction site almost daily during construction and made no objection to the width of the doors upon observing the width of the foundation cuts, the framing, or the completed structure, which both plaintiffs toured before the closing. The court finds that neither the width of the doors nor the kind of doors to be used was specified and that the plaintiffs have not proven either a departure from contract specifications or a defect with regard to the garage doors. CT Page 10806
2. Adequacy of structural support.
Many of the plaintiffs' claims concern the complaint that the house has inadequate structural support and that as a result there are doors out of plumb, that an area of flooring on the second floor squeaks and is not level, and that tile in the area of the kitchen floor over the main bearing beam has developed cracks. The court must assess the evidence in this regard in light of its finding that, having tried to cut some corners in the construction of the large house, Mr. Amato to some degree seeks to impose that blame the builder for some results that are more probably caused by his own method of completing his home. For example, Mr. Amato objects that the builder failed to fasten down the kitchen island, while the kitchen tile installer states that he was asked to tile under the island to avoid the costs of cutting tile to fit around a secured island.
Specifically, on the issue of the adequacy of beams and compliance with the contract, this court finds that the parties did not agree that the builder would build in accordance with lumber sizes indicated in the plans but that they substituted in Schedule A, the following requirements as to framing
 Framing: Construction Douglas fir or hem fir, span and sizes as per local building codes. 2" x 6" exterior studs. 2" x 4" interior studs. 5/8" CDX plywood glued and screwed to floor joists. 1/2" second layer of underlayment for tile areas. Plyscore roof sheeting .5". Sidewalks of .5" plywood-TYVEK outside of house.
Neither party called as a witness the subcontractor who installed the framing. A remodelling contractor, Robert B. Oppels, who was called as an expert witness by the plaintiffs described the framing of the attic floor, (which, unlike the framing supporting the second floor, was visible from the floor above) as comprised of a steel beam and 2" x 10" beams. The specifications as to framing set forth above do not specify the width of beams to be used, and given the reduction in the width of the house, the court finds that the sizes indicated in the pattern plans were not agreed to, but that, in the absence of a specific provision, the builder's obligation was to build in accordance with the requirements of the local building code.
Mr. Oppels did not testify that the framing failed to comply with the local building code but rather that the sagging and CT Page 10807 creaking in the master bedroom and family room were the result of failure to secure the floor joists to the steel beam in a workmanlike manner. As to the first floor, Mr. Oppels credibly explained that the lolly columns in the basement are not sufficiently even, creating sagging that affects some flooring. The defendant failed to rebut this testimony effectively and the court does not find credible his contention that the condition described is merely a squeak in the hardwood flooring. The court finds that these defects became evident within the first year after the plaintiffs purchased the house and that the builder failed to remedy them when requested to do so.
Mr. Oppels presented evidence as to the cost of repairing the defects in workmanship in the framing. Because the court finds that some of the figures on that list were shown to be inflated, the court has not adopted the figures offered but finds on the basis of the credible evidence as a whole that the cost of repairing the framing defects is $2,000.00 for the repairs in the basement for the support of me first floor, $1,800.00 for repairs to the first floor for support of the second floor, and $1,800.00 for repairs to the second floor framing for the third floor, for a total of $5,600.00.
3. Interior doors.
The plaintiffs proved by a fair preponderance of the evidence that either because of faulty installation or because of problems caused by the faulty framing, a number of the interior doors do not close properly. The court does not find that the doors warped because of failure to paint the edges, as the builder suggested. The court finds that the cost of repairing these doors is $1,450.00. The court has found that Mr. Oppel's price listings for repairs are inflated for many items based on the time described as needed to perform the listed tasks, and the court has therefore used the evidence as a whole as a basis for determining this element of damages.
4. Clothes Dryer Vent
The plaintiffs allege that the clothes dryer is not vented to the outdoors and that the applicable building code prohibits vending to the attic soffit. The builder agreed to re-vent the dryer as one of the items enumerated on the punch list he signed in order to induce the plaintiff to close, and he vented it to a soffit that vents to the outside. The plaintiffs failed to present any evidence that this venting did not comply with the CT Page 10808 applicable building code, as they failed to introduce that code into evidence.
5. Nailing of Roof Shingles
The court finds that as part of the punch list the builder agreed to hammer in some nails that has "popped" in the roof shingles and that he failed to perform that repair as agreed. The court finds that the cost of completing the hammering in such nails is $100.00.
6. Punch List
The plaintiffs inspected the house carefully before the closing and presented the builder with a punch list, listing details that needed to be completed as a condition to their completing the purchase on the date set for the closing. The builder agreed in writing to complete these items. He completed some of them but failed to return to complete all of them. Some of these items have been discussed above. The plaintiffs proved that the defendants failed to complete items 3, 19, 20, and 29 on the punch list, Exhibit D, but then failed to present evidence of the cost or completing them, so that the court lacks a basis for calculating damages.
A plaintiff who seeks money damages must present evidence which affords the trier a reasonable basis for measuring his or her loss. Expressway Associates III v. Friendly Ice Cream Corp. ,218 Conn. 474, 476 (1991); Gargano v Heyman, 208 Conn. 616, 620
(1987); Conaway v. Prestia, 191 Conn. 484, 493-94 (1983).
The one additional punch list item for which damages were proven was the securing of the island in the kitchen. Because it was the plaintiffs' choice to have the tile installed under the island, the court finds that cost of securing it is $100.00 and awards damages in that amount.
7. Furnace Malfunction
The plaintiffs further claim that the heating system was not properly installed and that a defect resulted in an accumulation of fumes and a "puff back" that soiled the interior of the house. Mr. Amato testified that after this event he either observed or was told about a piece of insulation having been found in the chimney opening. The functioning of furnaces is not a matter for CT Page 10809 judicial notice, and Mr. Amato claimed no expertise as to the operation of furnaces but merely surmised a causal connection. In the absence of testimony from a witness with the requisite expertise, this court is unable to determine whether the insulation was in the area described before as well after the explosion or puff back and whether it caused that event. Mr. Amato testified that a furnace company had adjusted the furnace and its controls after the plaintiff took possession, and the court cannot determine whether that work caused the puffback. Similarly, the plaintiff's claim that a period of ill health was caused by the malfunctioning of the furnace is speculative and unsupported by competent testimony.
The court finds that the plaintiffs have failed to prove by a preponderance of the competent, credible evidence that the defendant's actions or inactions caused the problems with the furnace.
8. Chimney
The plaintiffs claimed to have experienced leaks in the area around the chimney and damage to surrounding areas. Mr. Amato described the alleged leak very vaguely, and the contractor who inspected the area on his behalf did not confirm the existence of leaks or damage from leaks arising from faulty workmanship.
9. Misrepresentation
The plaintiffs have claimed in the fifth count of their complaint that Keszycki made false representations concerning his competence and experience in building homes. Though they have proven some defects in workmanship, they did not present evidence of misrepresentation.
10. CUTPA Claims
The court has summarized at page 3 above the plaintiffs' claims that the defendants violated CUTPA. The only factual claim that the court finds to have been proven among these claims is that the builder failed to complete the punch list items as promised. In addition, the plaintiffs claim that the builder's breach of express and implied warranties imposed by operation of General Statutes §§ 47-117 and 47-118 constitute violation of CUTPA. CT Page 10810
In Krawiec v. Blake Manor Development Corporation,26 Conn. App. 601 (1992), the Appellate Court ruled that a breach of a statutory warranty could be found to offend public policy and could thus support a finding of a CUTPA violation provided that all elements of a CUTPA violations were found.
Before the unfairness of a vendor's conduct becomes an issue, however, the plaintiff must establish that the conduct of the defendant was a "practice," since General Statutes § 42-110b
provides that
 No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct or any trade or commerce.
In Mead v. Burns, 199 Conn. 651 (1986), the Connecticut Supreme Court ruled that proof of a general business practice is necessary to establish a violation of CUTPA that is based on a claimed unfair insurance practice in violation of the Connecticut Unfair Insurance Practice Act. Since Mead, however, the Supreme Court has viewed isolated transactions or particular sales, rather than general policies or practices, as potential CUTPA violations. See, e.g., Bartone v. Robert L. Day Co., 232 Conn. 527
(1995); Rizzo Pool Co. v. Del Grosso, 232 Conn. 666, 684-85
(1995); Web Press Services Corp. v. New London Motors, Inc.,205 Conn. 479 (1987). The Court has, in these cases, apparently assumed without discussion that a single sale or single deceptive act in trade or commerce may be the basis of a CUTPA violation. This court therefore concludes that the requirement of a showing of a general practice in Mead resulted from the fact that CUIPA, General Statutes § 38-61, was the underlying standard, and that the Supreme Court does not interpret CUTPA as generally applying only to general practices rather than to individual transactions in trade or commerce.
Having concluded that the failure to honor express and implied warranties and the failure to perform punch list items after using the promise to perform them as an inducement to pay the full price constitute acts in the builder's trade or commerce, the court turns to the general standard for determining a CUTPA violation.
The Connecticut Supreme Court has summarized the applicable criteria as follows: CT Page 10811
 1) Whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise whether, in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness;
 2) Whether it is immoral, unethical, oppressive or unscrupulous;
 3) Whether it causes substantial injury to consumers, competitors or other businessmen.
Williams Ford, Inc. v. Hartford Courant Co., 232 Conn. 559, 591-92
(1995).
In assessing the third criteria, courts must determine whether the injury is substantial, whether it is outweighed by a countervailing benefit to consumers or competitors that the practice produces, and whether it is an injury that the consumer themselves could not reasonably have avoided. Williams Ford,Inc., 232 Conn. 592; McLaughlin Ford, Inc. v. Ford Motor Co.,192 Conn. 558, 569-70 (1984).
This court finds that defendant Keszycki was proven to have violated CUTPA according to the above standards in two respects. The first was his refusal to acknowledge and address the clear indications that his framing subcontractor had failed to install the framing in a manner that would result in level floors and operable doors. He failed to fulfill the warranties imposed by the new home warranty act in the face of abundant evidence that there was a deficiency in the framing.
The second respect in which defendant Keszycki engaged in an unfair act in his trade was in his failure to complete the punch list after inducing the plaintiffs to make full payment for a house that was not fully completed. While Mr. Keszycki may well have found Mr. Amato's repeated fault-finding annoying, and while he did not have a duty to continue to provide any and all services Mr. Amato demanded, such annoyances did not justify his failure to complete the items specified on the punch list, for which he had obtained full payment in advance. As a result of his unfair refusal, the plaintiffs suffered the ascertainable loss of having uncompleted items, some of which they hired others to complete. CT Page 10812
The punch list issue is not one simply of breach of contract. The builder's conduct served to induce the plaintiffs to forego the remedies they had, such as postponing the closing or negotiating a reduction in price to reflect lack of completion. This feature of the transaction distinguishes the situation from mere breach of contract and supports the court's finding that the plaintiffs have proven a CUTPA violation.
The court finds that the other claims of violations of CUTPA with regard to extra work or prices of extra items were not proven.
11. Damages
The court finds that the plaintiffs have proven actual damages in the amount of $5,700.00 for the cost of repairing the defects as to which evidence of cost was presented.
The plaintiffs seek an additional amount representing the claimed diminution in value in their house as a result of defects that they claim cannot reasonably be repaired. The only evidence of diminished value was Mr. Amato's conclusory statement that his home is worth $30,000.00 less than it should be. While the owner of property is competent to testify as to its value, this court does not find that Mr. Amato's estimate was anything more than speculative, and the court finds that the plaintiffs failed to prove diminished value by a fair preponderance of the competent, credible evidence.
Pursuant to General Statutes § 42-110g(d), the plaintiffs claim costs and reasonable attorney's fees. The court finds that such damages are warranted since the defendant's steadfast refusal to address the problems detailed above necessitated this litigation.
The court finds that plaintiffs' counsel reasonably spent 38 hours in representing the plaintiffs at trial and in proceedings prior to trial and that his claimed rate of $150.00 per hour is reasonable given the level of complexity of the case and the issues presented. The court awards counsel fees in the amount of $5,700.00, and expert witness fees in the amount of $900.00, which the court finds to be reasonable compensation for Mr. Oppel's preparation and time spent testifying. The plaintiffs shall recover their statutory costs upon filing a bill of costs CT Page 10813 with the clerk of the court.
Judgment shall enter in favor of the plaintiffs against defendant Mitchell Keszycki in the amount of $11,400.00 plus costs as set forth above.
Judgment shall enter in favor of defendant Sherwood Forest, Inc. as the transactions at issue are found not to have been with this entity.