[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM FILED AUGUST 12, 1997
The instant case has had a checkered history. Before the present proceeding there have been two trials and two appeals. The first trial before Judge DeMayo resulted in a judgment for the defendant. That decision was reversed on a procedural, ground[1] by the Appellate Court. Engelman v. ConnecticutGeneral Life Insurance Co., 38 Conn. App. 134 (1995). A second trial was held before Judge Booth. Again, judgment was rendered for the defendant and a second appeal ensued. This time the Supreme Court undertook the appeal pursuant to Gen. Stat. §51-199(c) and Practice Book § 4023. The Supreme Court reversed the trial court's decision and directed judgment for the plaintiff on his breach of contract claim. Further proceedings were ordered as to other claims of the plaintiff that are at issue. Engelman v. Connecticut General Life Insurance Co.,240 Conn. 287, 300 (1997).
Substantively this case involved the validity of the plaintiff's change of the beneficiary in an insurance policy on her life. That was the issue decided by the Supreme Court. The defendant has paid the plaintiff $100,000.00 which was the face amount of the policy. The third count of the amended complaint,[2] however, alleges that the conduct of the defendant constituted unfair insurance practices as defined by Gen. Stat. § 38a-816 and were violations of the Unfair Trade CT Page 3209 Practices Act, Gen. Stat. § 42-110 b et seq. The Supreme Court's mandate is for this court to determine the plaintiff's "CUIPA-CUTPA claim" and whether the plaintiff is entitled to prejudgment as well as post judgment interest.
 I.
The evidence consisted of the transcripts of the trial before Judge DeMayo and the exhibits that were then introduced.[3] The court's findings from the evidence are set forth below.
Robert Engelman, the plaintiff herein, is an attorney who represented Ralph and Ella Ryder, husband and wife, since 1961 or 1962. The Ryders operated a mobile home park on the Post Road in Milford. Ralph Ryder died on March 15, 1973. Ella Ryder died on July 2, 1990.
Among the Ryders' assets was policy no. 1021625 purchased from the defendant. Ralph Ryder was the owner of the policy, the insurance was on Ella Ryder's life and Ralph Ryder was the named beneficiary. A contingent beneficiary was Ella Ryder's nephew Philip Gary Zink.
Ella Ryder was appointed executrix of her deceased husband's estate on March 28, 1973. When discussing Ella's own estate plan in 1977, the plaintiff recommended that her estate become the beneficiary of policy no. 1021625. In a letter dated December 37, 1977, the plaintiff noted that the suggested change of beneficiary would mean that the insurance proceeds would be available for the payment of taxes on the estate. In the same letter the plaintiff pointed out that in any event the insurance proceeds would be includable in her estate for federal estate tax purposes but would be excluded from the state inheritance tax even though her estate was the beneficiary. Ella Ryder opted for the change. At her request, the plaintiff prepared a letter, dated February 3, 1978, that she sent to Arnold Dunphy at the defendant's office in Bloomfield. In this letter she informed the recipient that she wanted to change the beneficiary designations so that her estate would be the beneficiary not only on her policies with the defendant but on all of her policies and asked him to prepare change of beneficiary forms. Mr. Dunphy was directed to send the forms to the plaintiff as her attorney.
The letter to Arnold Dunphy brought a reply, dated February 24, 1978, from Bernadine Trombly of the defendant's Policy Holder CT Page 3210 and Field Services Department. Mrs. Trombly wrote that Ella Ryder had not furnished policy numbers and that personnel at the defendant were unable to find a record of coverage on her life. In 1978, the defendant's records were indexed according to a system known as "Alpha." Under "Alpha," the policy number was certainly the preferred locator of information; but there was some sort of indexing system whereby information could be accessed through use of a policyholder's name. Mrs. Trombley's letter states "numbers will be helpful in pulling these files."
When the plaintiff received Mrs. Trombley's letter, he did not have policy no. 1021625. Neither was the policy in the possession of Ella Ryder. She was, however, able to supply him with the number by sending in December, 1978, a photocopy of the notice of premium that she had paid on August 30, 1978.
On January 8, 1979, before Ella Ryder left on her annual winter trip to Florida, she signed a change of beneficiary document that the plaintiff had prepared. The document was in letter form and read as follows:
 1377 Boston Post Road Milford, Connecticut January 8, 1979
 Connecticut General Life Insurance Co. 950 Cottage Grove Road Bloomfield, Connecticut 06002
 Re: Policy No. 1021625 Mrs. Ella B. Ryder
Gentlemen:
 I hereby revoke all previous beneficiary designations with respect to the death proceeds on the above policy on my life, and I direct that the death proceeds shall be paid in one sum to the Executor of my estate.
 I retain all rights of ownership on the policy and all right to make a future change of beneficiary.
 My intention is that this change of beneficiary become effective immediately; however, if you wish confirmation of this beneficiary change on your own form, please supply the form to my CT Page 3211 attorney, Robert J. Engelman, Esq., Schwartz Knight, P.O. Box 679, New Haven Connecticut 06503.
Very truly yours,
Witnessed:
/s/ Robert J. Engelman /s/ Ella B. Ryder
Ella B. Ryder
The plaintiff prepared the change of beneficiary letter from a form in his office. The last paragraph in the letter was included because he was aware that even though a drafted change of beneficiary language may be technically correct, insurance companies prefer and want the same thing on their own special forms.
After sending the change of beneficiary letter to the defendant, the plaintiff received a standard letter dated January 15, 1979 from Gert MacWilliam of the Regional Service Division enclosing two copies of a Request for Change of Beneficiary Form. Alongside the word "Important" in the standard letter is the following language: "All forms must be dated, signed, witnessed and returned to us. Until this is done, the changes you have requested cannot be made." In the section entitled "Remarks" appearing at the bottom of the standard letter, Gert MacWilliam had typed "Per Mrs. Ella B. Ryder's letter dated June 8, 1979, I am enclosing a Change of Beneficiary form to be completed by her and returned to us for recording. A copy of Mrs. Ryder's letter is enclosed."
The plaintiff sent the two copies of the form received from Gert MacWilliams to Ella B. Ryder in Florida. His covering letter of January 18, 1979 informed her that the defendant insisted on its own form and asked that she sign both copies in the presence of a witness and return them to him so that he could forward them to the defendant.
The plaintiff never received the completed change of beneficiary forms from Ella Ryder. He did not know if she sent them directly to the defendant.
There was no further mention of policy no. 1021625 between the plaintiff and Ella Ryder until September 1983, when she CT Page 3212 called regarding a notice she received from the defendant concerning her ability to exchange the policy for paid-up insurance of a lesser amount. The notice addressed to Mrs. Ella B. Ryder described policy no. 1021625 as "your policy" and invited her to contact either her own insurance agent or the defendant's Regional Service Office if she is interested now or in the future in exercising "your paid up option."
On behalf of Ella Ryder, the plaintiff sought further information on the "paid up" option. In a letter, dated October 3, 1983, from Sylvia Pare of the Hartford Brokerage he learned that the paid up insurance would have an initial value of $82,937.00 to which would be added the yearly interest on the cash value of policy no. 1021625 at a guaranteed rate of 4 1/2 per cent. The cash surrender value as of October 15, 1983 was $53,675.00. The plaintiff sent the information to Ella Ryder on October 12, 1983. She decided against a conversion to a lower value paid up policy.
Ella Ryder suffered from cancer in the last years of her life and lung cancer is listed on her death certificate as the immediate cause of death. The plaintiff would go to her house and go through her checkbook to make certain that items that need to be paid were in fact paid. One such item was a check payable to the defendant in the amount of $2,550.00 dated August 31, 1989 that the plaintiff wrote and Ella Ryder signed. Several entries in her checkbook showed the issuance of similar checks of $2,550.00 which is the amount of the semi-annual premium for policy no. 1021625. After the death of Ralph Ryder, Ella Ryder had paid every premium.
After Ella Ryder's death on July 2, 1990, the plaintiff notified the defendant of her decease by telephone. In response, the defendant acting by one Sarah Summa, sent a letter dated July 20, 1990, in which a claimant's form for policy 1021625 was enclosed with instructions to return it signed by the executor of the decedent's estate together with the policy and a certified death certificate.
The plaintiff was appointed executor of Ella Ryder's estate on July 27, 1990. On August 30, 1990, he sent to the defendant, attention Sarah Summa, the claimant's statement including a declaration that policy no. 1021625 was lost, the certified death certificate and the certificate of the appointment of himself as the Executor of the Estate of Ella Ryder. In the accompanying CT Page 3213 letter, the plaintiff requested that Internal Revenue Service Form 712 entitled "Life Insurance Statement" be sent with the payment. Form 712 is a document that an executor must file with the Federal Estate Tax Return when life insurance is an asset of a reportable estate.
The defendant denied that the plaintiff as the Executor of the Estate of Ella Ryder had any claim to the proceeds of policy no. 1021625 for the reasons set forth in a letter, dated September 14, 1990, from Irene Guzik-DiNeno a claim examiner. These reasons were that although Mrs. Ryder requested a change of beneficiary in 1979, she never returned the defendant's forms for recording. But even if she had sent back the forms, Mr. Ryder was the owner of the policy and, therefore, only he could change the beneficiary. Ms. Guzik-DiNeno's letter went on to say that since Mr. Ryder is deceased, payment should be made to Philip Gary Zink the named contingent beneficiary. She requested the plaintiff to file a disclaimer and enclosed a claim form to be given to Philip Zink. The letter from Irene Guzik-DiNeno was the defendant's first assertion that it did not consider Ella Ryder to have been the owner of the policy.
On October 2, 1990, the plaintiff made a telephone call to Irene Guzik-DiNeno who, on the same day, sent him a copy of the application form for policy no. 1021625 and an extract from a life insurance policy entitled Benefits and Provisions including a section on change of Beneficiary. That section reads
 A new Beneficiary may be designated from time to time by filing at the Home Office, a written request therefor on a form satisfactory to the Company and signed by the owner . . . No change of Beneficiary shall take effect until such change shall have been recorded in writing by the company. When, however, the change has been so recorded, whether the Insured be then living or not, it shall take effect as of the date of execution of such written request therefor, but without prejudice to the company on account of any payment made or any action taken or permitted by the company before such recording.
Unless specifically provided otherwise, the interest of any beneficiary who predeceases the Insured shall vest in the Owner, his executors, administrators or assigns. CT Page 3214
Unless specifically provided otherwise, the right to change any beneficiary is reserved to the Owner.
The extract sent by Irene Guzik-DiNeno does not define or otherwise explain the phrases "on a form satisfactory to the Company" or "recorded in writing by the Company." Neither does the entire specimen policy that was introduced as a copy of lost policy no. 1021625.
Some time after receiving the information from Irene Guzik-DiNeno, the plaintiff engaged William Clendenen to represent him in the controversy. On June 9, 1992 Attorney Clendenen sent a letter to Ms. Guzik DiNeno demanding payment or if the demand were refused, suggesting that the proceeds of the policy be deposited in court in conjunction with an interpleader action. She sent his letter and her file to the defendant's legal department for review.
The legal department's reply came in a letter dated June 26, 1992 addressed to Attorney Clendenen from Raymond Millan, a member of the Nebraska Bar who was employed by the defendant. Mr. Millan's opinion was that the terms of the policy were clear and that the defendant was obligated to make payment to Philip Gary Zink the named contingent beneficiary.
Also on June 26, 1992, Raymond Millan, Esq. sent a more inclusive letter to Attorney Clendenen and to Philip Gary Zink, 200 Margaret Lane, Orange. In this letter, Mr. Millan acknowledged that the defendant's file contained a letter signed by Ella Ryder making the excecutor of her estate the beneficiary and that in response to her letter the defendant sent a change of beneficiary form to her attorney Robert Engelman which form was never returned. Further Mr. Millan wrote that insurance contracts issued by the defendant provide that any change of beneficiary must be in writing on a form satisfactory to the company and that a change of beneficiary will not take effect until recorded in writing by the company. As he explained, "[i]t is company practice to require that a Change of Beneficiary be submitted on a company provided form to constitute a `form satisfactory to the company.'" Because this condition was not satisfied, the defendant did not change the beneficiary as requested. In closing, Mr. Millan stated payment would be made to Philip Gary Zink within thirty days. The position taken by Raymond Millan, Esq. seemingly differed from that of Irene Guzik-DiNeno. His apparent stance was not that Ella Ryder lacked power to change CT Page 3215 the beneficiary but that she did not do so properly. Mr. Millan testified that he was fully conversant with the defendant's procedures for the handling of death claims.
By letter dated July 2, 1992, Attorney Clendenen again asked for an interpleader action so that a court could determine whether the Estate of Ella Ryder or Philip Gary Zink was entitled to the proceeds or, in lieu of a suit, the defendant was asked to hold the money. The defendant disregarded these requests and on July 30, 1992 paid Philip Gary Zink $108,320.00 of which $100,000.00 was the face amount of the policy and $8,320.00 represented interest attributable to the late payment. Authorization to pay Mr. Zink came from George Case, one of the defendant's vice-presidents.
At the present time requests to change beneficiaries for policies issued by the defendant are handled by a department known as Customer Service. Formerly this department was known by other names such as Policyholder and Field Service, Policyholder Service Settlements Plan Division and Regional Service Division.
When Gert MacWilliams sent the defendant's change of beneficiary to the plaintiff on January 15, 1979 she would have decided that Ella Ryder and the plaintiff as her representative were entitled to receive the form. Gert MacWilliams was trained in the defendant's procedures for handling change of beneficiary requests. The defendant's policy was to send forms for changing a beneficiary only to an owner of a policy or to someone representing an owner. When Gert MacWilliams sent the form, the defendant's file indicated that Ralph Ryder was deceased. The information was given to the defendant by a person described in the file as Greg Anderson, Agent. Mr. Anderson requested a change of beneficiary form because Ralph Ryder died, according to the note in the file, "about five years ago." Anderson was told that the defendant did not send such a form in blank. In the defendant's file there was no record of any further communication from Anderson and the defendant never sent a change of ownership form nor took any action to ascertain who succeeded Ralph Ryder as the owner of the policy. In point of fact, Ellen Ryder became the owner of the policy on March 28, 1993 when she was appointed executrix of her husband's estate. Pursuant to the express language of policy no. 1021625, she also acquired whatever interest he may have had as the named beneficiary.
Even earlier notice of the death of Ralph Ryder existed. The CT Page 3216 defendant had prepared a form 712 pertaining to a group term policy for $10,000.00 on which Ralph Ryder was the insured and Ella Ryder was the beneficiary. The date on the form 712 was October 14, 1973.
The sentence in Raymond Millan's more inclusive letter of June 26, 1992 that states "It is company practice to require that a Change of Beneficiary be submitted on a company provided form to constitute a `form satisfactory to the company'" is simply not a correct statement of the defendant's policy or practice. The change of beneficiary forms of the American Bar Association and the American Banker's Association are accepted by the defendant. Also acceptable is the form of the National Association of Life Underwriters although, with regard to this form, the defendant attempts to substitute its own document.
Manuals and sample forms have been prepared for use by the defendant's employees in change of beneficiary situations. A manual that was in existence on January 8, 1979, when Ella Ryder sent her letter reads:
 The sample forms will cover the great majority of cases. Any case not covered by the sample forms should be referred to Settlement Plans Division — 217. If the request has been submitted in the form of a letter and is quite involved, it may be advisable to send the letter or a copy of it, to Settlement Plans.
As previously noted, Settlement Plans is now known as Customer Service. A procedural manual that became effective on September 5, 1980 and therefore was in existence during the period of this dispute contains the following provision for non-standard forms (meaning forms other than company-provided or company-approved): "where there is an unclear designation — including a designation prepared by a policyholder's attorney, PHS will evaluate the intent and prepare standard form. If the agent returns the form as not meeting the original intent, and insists on use of original form, the Form will be sent to legal for review." PHS stands for Policyholder Services one of the predecessors to the present Customer Services Office. The excerpts from these manuals demonstrate a company policy that "nonstandard" requests for a change of beneficiary were not automatically precluded from being accepted, reviewed and recorded.
A comparison of Ella Ryder's letter changing the beneficiary CT Page 3217 with the defendant's standard form reveals that each contains a designation of the beneficiary, a statement of whether or not the right to make changes of the beneficiary in the future is reserved and a signature line. The only difference is that the standard form has places for two witnesses whereas the plaintiff was the only witness to Ella Ryder's signature.
As a matter of practice, the defendant did not investigate conflicting claims to the proceeds of an insurance policy. The defendant's custom was to write to the claimants and ask them to try to resolve their differences among themselves. The defendant has a sample letter for this purpose. In this case no such letter was ever sent.
The claim of Philip Gary Zink to the proceeds of policy no. 1021625 was dated July 27, 1992 and was filed only after he was solicited by the defendant. The claim was received July 29, 1992 and a check for Mr. Zink was dated and sent the next day. The claim examiner Irene Guzik-DiNeno was trying to comply with Raymond Millan's statement that payment would be made to Mr. Zink within thirty days. One of the defendant's employees recalled that on five or six occasions the company had initiated interpleader actions. The same employee testified that the instant case was the only one of which she was aware in which the defendant unilaterally chose to pay one of two competing claimants.
 II.
First and foremost among the issues to be determined is whether, in light of the facts found, the defendant violated the Connecticut Unfair Insurance Practices Act (CUIPA) and the Connecticut Unfair Trade Practices Act (CUTPA). A resolution in the plaintiff's favor will entitle him to punitive, as well as compensatory, damages and to an attorneys fee. Lees v. MiddlesexIns. Co., 219 Conn. 644, 651 (1991); see Gen. Stat. §42-110g(a) and (d).
The relationship between CUIPA and CUTPA was definitely established by Mead v. Burns, 199 Conn. 651 (1986). By the enactment of the two statutes with their similar prohibitions, the General Assembly manifested an intention to subject insurance practices to the regulatory schemes of both. Id, 199 Conn. 663. Subsequently it was made clear that when a CUTPA claim is based on a public policy governing insurance practices, as enunciated CT Page 3218 in CUIPA, it is the CUIPA allegation that forms the essence of a plaintiff's claim rather than the more generalized CUTPA languageLees v. Middlesex Ins. Co., 229 Conn. 842, 850 (1994); see Meadv. Burns, supra, 199 Conn. 664-66. Put another way, it is the CUIPA violation that is the equivalent of CUTPA's "cigarette rule."[4]
In a CUIPA and CUTPA claim, the insurer's liability is ordinarily based on its conduct in settling or failing to settle the insured's claim or on its claims settlement policy in general. The focus is on the conduct of the insurer whose duty does not come from the policy involved but is a duty imposed by statute. Heyman Associates No. 1 v. Insurance Company ofPennsylvania, 231 Conn. 756, 790 (1995). The plaintiff claims to have proven that the defendant's conduct violated three sections of CUIPA, namely: 38a-816 (1), (2) and (6).[5]
As to § 38a-816(6), the court must disagree despite the plaintiff's frustrated tirade on his cross examination. The court's findings show that with respect to conflicting claims, the defendant did have a custom or policy of asking the claimants to settle the conflict among themselves and that on five or six occasions, presumably when settlement failed, interpleader actions were brought. The problem with the plaintiff's view is that the practice alleged to be unfair must be shown to have occurred with such frequency as to indicate that it was a general business practice. No evidence was produced to show the number of conflicting claims, how frequently the defendant sent letters urging settlement and whether claimants were harmed thereby. What was proven in this case was a disregard by the defendant of several of its existing policies. But multiple acts of misconduct in the handling of a single claim do not establish a violation of § 38a-816(6). Lees v. Middlesex Ins. Co., supra,229 Conn. 849.
From what has just been written, the court's conclusions that the defendant violated § 38a-816(1) and (2) are apparent. In pertinent part, § 38a-816(1) defines an unfair or deceptive act as (a) any statement that misrepresents the conditions or terms of any insurance policy. Section 38a-816(2) defines as an unfair and deceptive act or practice the publishing of misleading statements with respect to the business of insurance. The court agrees with the analysis in Bronson Townsend Co.. Cornaglia,1 C.S.C.R 814 (1986), that the absence of the "general business practice" language found in § 38a-816(6) and the presence of CT Page 3219 the words "any insurance policy" in § 38a-816(1) means that a single act of insurance misconduct can constitute a violation of § 38a-816(1). In the court's opinion, the analysis is also proper for § 38a-816(2).
Instead of a single act, there was presented a battery of published misinformation. The first example was Irene Guzik-DiNeno's letter to the plaintiff informing him that Ella Ryder was not the owner of the policy. This letter was written years after the defendant had been put on notice of Ralph Ryder's death and years after the defendant had started to treat Ella Ryder as the owner of the policy. Then there was the correspondence from Raymond Millan that the court has found to be at variance with the policies expressed in the defendant's claims manuals. No one checked Ella Ryder's change of beneficiary letter to determine if it, in fact, accorded with the defendant's company-provided or company-approved forms. CUIPA (§ 38a-816 (1)) does not require that the misrepresentations be accompanied by an intent to deceive or that the plaintiff relied on them. The statute only requires that such misrepresentations were made. Bronson Townsend Co. v. Cornaglia, supra, 1 C.S.C.R. 814.
One can speculate, as the defendant's brief mentions, whether the situation would have changed if the plaintiff had filed a probate certificate showing that Ella Ryder had been the executrix of her husband's estate. Viewed against the letters from Ms. Guzik-DeNino and Mr. Millan, the answer seemingly is no.
Having proved the CUIPA violation, the plaintiff had to complete the CUTPA picture with proof of an "ascertainable loss." Gen. Stat. § 42-110g(a). This means the production of some basis for a reasonable estimate of the damages suffered. RizzoPool Co. v. Del Grasso, 232 Conn. 666, 684 n. 28 (1995);Hinchliffe v. American Motors Corporation, 184 Conn. 607, 619
(1981). This requirement was easily satisfied by the insurance policy and the correspondence pertaining to demand and denial. The plaintiff is entitled to punitive damages and counsel fees.
 III.
Punitive damages are awarded generally on a theory of deterrence to a defendant or others when the evidence shows an intentional or wanton violation of a litigant's rights. Champagnev. Raybestos Manhattan Inc., 212 Conn. 509, 533 (1989). In Connecticut, the traditional rule limits punitive damages awards CT Page 3220 to the expenses of litigation (including an attorneys fee) less taxable costs. Berry v. Loiseau, 223 Conn. 786, 827 (1992). A different situation prevails where CUTPA claims are concerned. The statute, § 42-110g(a) and (d) permits a discretionary award of punitive damages and an attorneys fee. Barco AutoLeasing Corporation v. House, 202 Conn. 106, 120 (1987). The criteria, however, remains the same. "In order to award punitive damages, evidence must reveal a reckless indifference to the rights of others or an intentional and wanton violation of those rights." Gargano v. Heyman, 203 Conn. 616, 622 (1987); Staehle v.Michael's Garage, Inc., 35 Conn. App. 455, 462 (1994).
Intent refers to an actor's desire to cause the consequences of his act or to an actor's belief that those consequences are substantially certain to result from it. Suarez v. DickmontPlastics Corp., 229 Conn. 99, 108 (1994). Wanton misconduct is conduct that indicates a reckless disregard of the consequences of the action. West Haven v. Hartford Ins. Co., 221 Conn. 149,160 (1992). The terms willful, wanton or reckless conduct have been treated as meaning the same thing. Dubay v. Irish,207 Conn. 518, 533 (1988).
Applying these definitions to the facts the court is convinced that the actions of the defendant's employee Raymond Millan could be categorized as either intentional or reckless. A few additional findings are in order. In a telephone call to Attorney Clendenen. Mr. Millan said the defendant would hold up on the payment to Philip Gary Zink if the suit were filed early enough to keep the defendant from paying and a copy of the filed complaint was sent directly to him. Donna Hiltpold, the employee who testified that the instant claim was the only one where the defendant decided unilaterally to pay one of the conflicting claimants, based her statement on work experience of twenty-four years and the processing of 4,800-5,000 death claims.
From its initial and supplementary findings, the court concludes that Raymond Millan by declining to interplead the plaintiff and Philip Gary Zink invited this law suit. Millan then offered to hold the money if the plaintiff brought suit within thirty days, in time to stop the payment to Zink. And when Millan's self-imposed thirty-day limit passed, he advised that Zink be paid immediately, an act that, according to Donna Hiltpold, was unprecedented.
A recognized method for determining punitive damages under CT Page 3221 CUTPA is to award an amount that is a multiple of actual damages.Staehle v. Michael's Garage, Inc., supra, 35 Conn. App. 463. Here the actual damages were $100,000.00. The court will add an additional 60% or $60,000.00 as punitive damages.
A computation of the plaintiff's attorneys fee must wait for a later day. No evidence as to a requested fee has, as of yet, been submitted. Mindful that the reasonableness of such a fee is a litigable item, Barco Auto Leasing Corporation v. House. supra,202 Conn. 121, the court has not looked at Exhibit CC for Identification which the index of exhibits at the first trial describes as pertaining to an attorneys fee. Upon receipt of this memorandum, counsel are directed to contact the clerk so that a prompt hearing may be scheduled.
 IV.
The parties agree that an award of prejudgment interest is discretionary with the court and is based upon equitable principals. West Haven Sound Development Corporation v. WestHaven, 207 Conn. 308. 321 (1988). Their disagreements are first: whether the fact pattern of this case warrants prejudgment interest; and second, if prejudgment interest is to be awarded, what is its starting date?
At the outset, the court must decide whether the "substantial compliance doctrine" adopted by the Supreme Court, Engelman v.Connecticut General Life Insurance Co., supra, 240 Conn. 297-98, is such a radical departure from pre-existing law that equitably prejudgment interest should be foregone. An examination of the predecessors of Engelman discloses that Bachrach v. Herrup,128 Conn. 74, 76 (1941), and O'Connell v. Bradley, 136 Conn. 475, 480
(1950), involved instances where, for one reason or another, the policy holder was unable to surrender the policy, as required, so that a change of beneficiary could be endorsed thereon. Nor until the dicta in Aetna Life Insurance Co. v. Hartford National Bankand Trust Co., 146 Conn. 537, 541 (1959), was thought apparently given to broadening the exception to the rule that a change of beneficiary can be effected only by following the procedure prescribed by the policy; so that unspecified situations could, in the name of equity, be included.
This court would describe the holding in Engelman, supra, by which the dicta in Aetna Life Ins. Co., supra became the law as a natural progression rather than a radical departure in our CT Page 3222 jurisprudence. Before the Supreme Court's decision in Engelman, the dicta in Aetna Life Ins. Co. had been repeated in Kulmacz v.New York Life Ins. Co., 39 Conn. Sup. 470, 474 (App. Sess. 1983), and projected as Connecticut law by Mann v. Metropolitan Life InsCo., 683 F. Sup. 27, 30 (D. Conn. 1988). Moreover the decision inEngelman places Connecticut with the majority of jurisdictions that have considered the doctrine of "substantial compliance."240 Conn. at 297. Prejudgment interest should not be disallowed on this account.
Nor should prejudgment interest be lessened because the Appellate Court's decision extended the time for final resolution. The Appellate Court noted that at the time the plaintiff's complaint contained a request for a declaratory judgment and that Philip Gary Zink had neither been made a party nor given notice of the action as required by Practice Book § 390(d). Failure to comply with § 390 deprived the trial court of subject matter jurisdiction. Mannweiler v. LaFlamme,232 Conn. 27, 32 (1995); Engelman v. Connecticut General Life Ins. Co.,supra, 38 Conn. App. 138. The defendant, however, could have raised the question of subject matter jurisdiction long before the case reached the Appellate Court. Serrani v. Board of Ethics,225 Conn. 305. 308 (1993).
In determining whether to award prejudgment interest, the question is whether money owed to the plaintiff was wrongfully detained and if so from when. The wrongful detention was established by the Supreme Court's decision and this court holds that the proceeds of the policy became due as of August 30, 1990, the date of the submission of the plaintiff's claim. Pursuant to the specimen insurance policy, the defendant contracted "to pay the face amount . . . to the beneficiary upon receipt of due proofs of death of the insured." Ordinarily interest begins to run from the time the amount is due and payable to the plaintiff.West Haven Sound Development Corporation v. West Haven, supra,207 Conn. 321.
Pursuant to Gen. Stat. § 37-3a, the plaintiff is awarded interest at the rate of ten percent per year from August 30, 1990 to May 27, 1997 when the face amount of the policy was paid. By virtue of the same statute, the plaintiff is entitled to postjudgment interest at the same rate.
V. CT Page 3223
On December 28, 1992, the plaintiff filed an offer of judgment as authorized by Gen. Stat. § 52-192a and Practice Book §§ 342-350. In pertinent part, § 52-192a(b) reads "If . . . the plaintiff has recovered an amount equal to or greater than the sum certain stated in his `offer of judgment' the court shall add to the amount so recovered twelve per cent annual interest on said amount, computed from the date the complaint was filed . . . if the `offer of judgment' was filed not later than eighteen months from the filing of the complaint." The statute also permits a reasonable attorneys fee to be added in an amount not to exceed $350.00. The offer was to settle the case for $95,000.00. Since the complaint was filed on August 29, 1992, the eighteen month "bonus" provision applies.
Section 52-192a was enacted as an impetus to settle cases and has been described as punitive in nature. Lutynski v. B.B. and J.Trucking Inc., Conn. App. 806, 812-13 (1993), aff'd 229 Conn. 525
(1994). Whenever a plaintiff's recovery is equal to or greater than the offer of judgment, the imposition of 12% interest is mandatory. Gillis v. Gillis, 21 Conn. App. 549, 554, cert. denied215 Conn. 815 (1990). The term "recovery" includes attorneys fees, when authorized, DeNike Tree Co. v. Butler,21 Conn. App. 366. 369 (1990), and discretionary interest. Id., Gillis v.Gillis, supra 21 Conn. App. 556.
Admittedly, this case involves, in part, the imposition of interest upon interest. On the authority of Loomis Institute v.Windsor, 234 Conn. 169, 181 (1995), and Munroe v. Ernhart Corp.,46 Conn. App. 37, 44-45 (1997), the defendant suggests that equitably prejudgment interest should consist only of the 12% per annum mandated by § 52-192a. In both Loomis Institute andMunroe, trial courts declined to award discretionary prejudgment interest because of the mandatory interest created by offers of judgment.
Neither Loomis Institute v. Windsor, supra, nor Monroe v.Ernhart Corp., supra, purport to serve as precedents[6] on the question of prejudgment interest and both decisions acknowledge that an award of prejudgment interest (§ 37-3a) is discretionary with the trial court.
In the preceding section, the court implied and now expressly states that it declines to follow Loomis Institute and Munroe. In this court's view, the defendant's predicament has resulted from failures by its employees to follow company prescribed policies CT Page 3224 and procedures.
 VI.
To recapitulate, the judgment to be rendered for the plaintiff will include the following:
 Compensatory damages $100,000.00 (paid May 27, 1997) Prejudgment interest $65,233.40 (@ 10% § 37-3a from August 30, 1997 to May 9, 1997, the date of the judgment) Post-judgment interest $493.20 (@ 10% § 37-3a from May 10 to May 27, 1997, the date of payment of the $100,000.00) Punitive damages $60,000.00 (§ 42-110g(a)) Attorneys fee To be determined (§ 42-110g(d) Offer of Judgment To be determined (§ 52-192a) $350.00 attorneys fee plus 12% interest per annum on total recovery from August 25, 1992, the date the claim was submitted, to the date when prejudgment interest, punitive damages and attorneys fees are paid.
BARNETT, J.