******************************************************

The ''officially released'' date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the ''officially released'' date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

LEE WINAKOR *v.* VINCENT SAVALLE
(AC 42306)

Prescott, Moll and Harper, Js.

*Syllabus*

The plaintiff, who had hired the defendant to perform certain home construc-
tion site work in conjunction with the construction of a new home,
sought to recover damages for breach of contract and for violation of
the Connecticut Unfair Trade Practices Act (CUTPA) (§ 42-110a et seq.),
alleging that the work the defendant performed was in violation of the
Home Improvement Act (§ 20-418 et seq.). The trial court rendered
judgment in part in favor of the plaintiff and awarded the plaintiff
compensatory damages and attorney's fees. The trial court determined
that the defendant had breached the contract by failing to complete the
project on time and had used improper techniques and methods to fulfill
the contract. On the defendant's appeal to this court, *held*:

1. The trial court improperly determined that the defendant was liable under
   CUTPA on the basis of its finding that the defendant violated the Home
   Improvement Act, as the work performed by the defendant was part of
   new home construction and, thus, fell within the statutory exception
   contained in § 20-419 (4), and as such, the defendant's services did not
   constitute home improvement and there existed no home improvement
   contract that the defendant violated under the act: contrary to the plain-
   tiff's claim, interpreting the definition of home improvement to include
   work performed on land regardless of whether there is an existing
   building would render the clause providing for an exception to new
   home construction meaningless; furthermore, as the defendant did not
   violate CUTPA and without any contractual provision on which properly
   to base an award of attorney's fees, there was no basis for the plaintiff's
   recovery of any attorney's fees and costs in connection with the alleged
   CUTPA violation.

2. The defendant could not prevail on his claim that the trial court improperly
   rendered judgment in favor of the plaintiff on his breach of contract
   claim because the trial court's findings were clearly erroneous, the
   plaintiff never having proved beyond reasonable speculation that the
   defendant's conduct caused damage to the plaintiff's property; the record
   provided sufficient evidence to support the trial court's finding of a
   breach of contract claim, the trial court was free to credit the testimony
   of the plaintiff's witnesses in concluding that the defendant's conduct
   caused the damages suffered by the plaintiff, and the defendant's argu-
   ment that there were other possible causes for the plaintiff's damages
   was inconsistent with the standard by this court must review the trial
   court's findings, which is not whether there were other conceivable
   causes but, rather, whether there was evidence to allow the court to
   find that the defendant's conduct was the cause.

Argued March 3—officially released July 7, 2020

*Procedural History*

Action to recover damages for breach of contract,
and for other relief, brought to the Superior Court in
the judicial district of New London and tried to the
court, *Frechette, J.*; judgment in part for the plaintiff,
from which the defendant appealed to this court; there-
after, the trial court granted the plaintiff's motion for
attorney's fees, and the defendant amended his appeal.
*Reversed in part; judgment directed.*

*Patrick J. Markey*, for the appellant (defendant).

*Paul M. Geraghty*, with whom was *Jonathan
Friedler*, for the appellee (plaintiff).

*Opinion*

PRESCOTT, J. The principal issue in this appeal is whether services provided by a contractor as part of the construction of a new residence fell outside of the statutory purview of the Home Improvement Act (Improvement Act), General Statutes § 20-418 et seq. The defendant, Vincent Savalle, appeals from the judgment of the trial court rendered in favor of the plaintiff, Lee Winakor, in which the court concluded that the defendant was liable to the plaintiff in the amount of $100,173.32 for breach of contract, violation of the Improvement Act, and violation of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110b et seq. On appeal, the defendant claims, among other things, that the trial court improperly rendered judgment in favor the plaintiff on (1) the CUTPA count because it predicated CUTPA liability on the erroneous determination that the defendant had violated the Improvement Act, and (2) the breach of contract count because there was insufficient evidence to establish causation, which is necessary to prove damages. The defendant also claims that the trial court abused its discretion in awarding attorney's fees to the plaintiff. We agree with the defendant on his claim regarding the improper imposition of CUTPA liability and the award of attorney's fees but disagree with him on his claim that the court improperly found for the plaintiff on the count alleging a breach of contract. Accordingly, we affirm in part and reverse in part the judgment.

The following facts, as found by the court in its memorandum of decision or as undisputed in the record, and procedural history are relevant to the defendant's claims. In 2005, the plaintiff purchased real property located at 217 Legend Wood Road in North Stonington. In 2012, he entered into a contract with Golden Hammer Builders, LLC (Golden Hammer), through its principal, Brian Mawdsley, to construct a new single-family home on the property (GH contract). The GH contract contemplated site work and construction of the home for $425,300 and permitted the plaintiff to find another contractor to perform the site work and to subtract the cost of such work, $55,000, from the total cost.[1]

In mid-2012, the plaintiff met with the defendant to consider hiring him to perform the site work. After meeting with the plaintiff to discuss the scope of the site work, the defendant submitted a bid for $50,000, which was $5000 less than the $55,000 it would have cost the plaintiff under the GH contract. As a result, the plaintiff hired the defendant to perform the site work. The plaintiff drafted a contract pursuant to which the defendant would purchase materials and provide a variety of services that originally were included in the GH contract.[2] The parties subsequently signed a written contract on September 1, 2012, in which the plaintiff agreed to pay the contract price of $50,000 for the site

work, and the defendant agreed to complete the contract within one year of the start date. Subsequently, Mawdsley applied, on the plaintiff's behalf, for a new home building permit on September 17, 2012, under his new home construction contractor's license. The building permit was issued on January 28, 2013.

The defendant began working at the site in September, 2012. The trial court found that "[h]e hammered out a ledge for the foundation, installed a septic tank, constructed retaining walls, began site work, installed a propane tank and gas lines (which he later agreed to do), installed the well electrical line, and partially finished the driveway." In December, 2013, Golden Hammer finished building the house, and the plaintiff received a partial certificate of occupancy. In January, 2014, a full certificate of occupancy was issued for the house.

At that time, however, the defendant had not yet completed his work in accordance with his contract with the plaintiff. The Planning and Zoning Commission of the Town of North Stonington (town) issued a letter to the plaintiff indicating that the house substantially conformed to its zoning regulations and would be approved for zoning compliance on the conditions that, among other things, "the final grading, landscaping, and soil stabilization be completed within [six] months" and the driveway be widened.

On January 18, 2014, the defendant entered into a second contract with the plaintiff. That agreement required the defendant to complete the work that was set forth in the first contract by April 1, 2014, for an additional $10,000. At this point, the plaintiff already had paid the defendant $53,000.

Over time, it became apparent that there were problems associated with the quality of the defendant's work.[3] Due to the plaintiff's dissatisfaction with the defendant's workmanship and the defendant's failure to complete the project according to schedule, the plaintiff terminated his relationship with the defendant in April, 2014. Subsequently, the plaintiff hired another contractor, Charles Lindo, to remedy the flaws in the work that the defendant had completed and to finish the work that the defendant had failed to complete. Lindo ultimately completed the project at additional cost to the plaintiff. In October, 2014, the town notified the plaintiff that his new residence fully complied with its zoning regulations.

On May 28, 2015, the plaintiff commenced this action against the defendant. The operative amended complaint asserted five separate counts: breach of contract (count one); unjust enrichment (count two); violations of the New Home Construction Contractors Act (New Home Act), General Statutes § 20-417a et seq. (count three);[4] (4) violations of the Improvement Act (count

four); and violations of CUTPA (count five). On August 12, 2015, the defendant filed his answer and a counterclaim, in which he alleged that "[t]he plaintiff is indebted to the defendant in the amount of $28,000 for the services he performed and the materials he supplied." In response, the plaintiff filed his answer and a special defense asserting that the defendant is barred from recovering from the plaintiff due to his violation of the New Home Act.

The case was tried before the court, *Frechette*, *J.*, over nine days, beginning on March 6, 2018. Subsequently, the parties submitted posttrial briefs.

In a memorandum of decision issued on August 21, 2018, the court found that the defendant had breached his contract with the plaintiff by not completing the project on time and by "using improper techniques and methods to [perform] the contract . . . [causing] the plaintiff [to incur] additional expenses to repair and finish the work the defendant was contractually required to do." Having found a breach of an enforceable contract, the court concluded that the plaintiff was not entitled to recover for unjust enrichment. See *Gagne* v. *Vaccaro*, 255 Conn. 390, 401, 766 A.2d 416 (2001) (lack of remedy under contract is precondition for recovery under unjust enrichment theory). The court further determined that the defendant violated the Improvement Act by failing to comply with certain statutory requirements regarding the form of the contract. Specifically, it found that the contract did not contain the name, address, and registration number of the contractor; did not include a notice of the homeowner's cancellation rights; did not disclose whether the defendant worked as a sole proprietor; and did not contain the entire agreement by not including, for example, provisions regarding the propane tank installation. Finally, the court concluded that, on the basis of the Improvement Act violations, the defendant committed a per se CUTPA violation. Accordingly, the court rendered judgment in favor of the plaintiff on counts one, three, four, and five of the complaint and awarded the plaintiff compensatory damages totaling $100,173.32. Subsequently, the defendant filed a motion to reargue, challenging, among other things, the court's findings regarding the applicability of the Improvement Act, the existence of a contract, and the damages awarded to the plaintiff. The motion was denied, and the defendant's appeal followed.

After judgment was rendered, the plaintiff also filed a motion seeking an award of attorney's fees on the basis of the CUTPA violation. On August 19, 2019, the court held a hearing on the plaintiff's motion for attorney's fees. Thereafter, on September 4, 2019, the court issued an order awarding the plaintiff $126,126.91 in attorney's fees and $2412.05 in costs. The defendant amended his appeal to challenge the court's order

regarding attorney's fees.

## I

We first address the defendant's claim that the court improperly rendered judgment in favor of the plaintiff on the CUTPA count on the basis of its finding that the defendant violated the Improvement Act.[5] The defendant primarily asserts that the Improvement Act was inapplicable in this case because the work that he performed constitutes new home construction, which is explicitly exempted by the Improvement Act, and, thus, could not support the trial court's imposition of CUTPA liability and its subsequent award of damages and attorney's fees, which flowed therefrom. We agree that the court improperly determined that there was CUTPA liability based on an underlying violation of the Improvement Act. Accordingly, we reverse the court's judgment on counts three, four, and five.

We begin by setting forth the standard of review applicable to this claim.

"CUTPA provides that [n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce. . . . It is well settled that whether a defendant's acts constitute . . . deceptive or unfair trade practices under CUTPA, is a question of fact for the trier, to which, on appellate review, we accord our customary deference." (Citation omitted; internal quotation marks omitted.) *Landmark Investment Group, LLC* v. *Chung Family Realty Partnership, LLC*, 125 Conn. App. 678, 699, 10 A.3d 61 (2010), cert. denied, 300 Conn. 914, 13 A.3d 1100 (2011). Whether a defendant is subject to CUTPA and its applicability, however, are questions of law. Id., 700. "[If] a question of law is presented, review of the trial court's ruling is plenary, and this court must determine whether the trial court's conclusions are legally and logically correct, and whether they find support in the facts appearing in the record." (Internal quotation marks omitted.) Id., 701.

"Our courts have interpreted [General Statutes] § 42-110g (a) to allow recovery only when the party seeking to recover damages meets the following two requirements: First, he must establish that the conduct at issue constitutes an unfair or deceptive trade practice. . . . Second, he must present evidence providing the court with a basis for a reasonable estimate of the damages suffered. . . . Our Supreme Court has stated on several occasions that under the first requirement, the failure to comply with the . . . Improvement Act is a per se violation of CUTPA by virtue of General Statutes [§ 20-427 (c)], which provides that any violation of the . . . Improvement Act is deemed to be an unfair or deceptive trade practice." (Internal quotation marks omitted.) *Scrivani* v. *Vallombroso*, 99 Conn. App. 645, 651–52, 916 A.2d 827, cert. denied, 282 Conn. 904, 920

A.2d 309 (2007).

A

The defendant argues that the plaintiff failed to satisfy the first requirement of proving his CUTPA claim because he failed to establish that the defendant's conduct constitutes an unfair or deceptive trade practice. Specifically, he argues that the court's determination that he violated the Improvement Act—which served as the sole basis for establishing CUTPA liability—was legally flawed because the Improvement Act is not applicable under the facts of this case, as there was no "home improvement contract" between him and the plaintiff, as contemplated by General Statutes § 20-429. We agree.

Resolution of this claim necessarily involves interpretation of the Improvement Act. The applicability of a statute to a given situation is a matter of statutory construction. "Issues of statutory construction raise questions of law, over which we exercise plenary review. . . . The process of statutory interpretation involves the determination of the meaning of the statutory language as applied to the facts of the case, including the question of whether the language does so apply. . . .

"When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. . . . General Statutes § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes." (Footnote omitted; internal quotation marks omitted.) *Western Dermatology Consultants*, *P.C.* v. *VitalWorks, Inc.*, 146 Conn. App. 169, 199, 78 A.3d 167 (2013), aff'd, 322 Conn. 541, 153 A.3d 574 (2016). "A fundamental tenet of statutory construction is that statutes are to be construed to give effect to the apparent intention of the lawmaking body. . . . Where the words of a statute are clear, the task of a reviewing court is merely to apply the directive of the legislature since where the wording is plain, courts will not speculate as to any supposed intention because the question before a court then is not what the legislature actually intended but what intention it expressed by the words that it used. . . . When two constructions [of a word] are possible, courts will adopt the one which makes the statute effective and workable . . . . [Further, a] statute should be construed so that no word, phrase or clause will be rendered meaningless." (Citations omitted; internal quotation marks omitted.) *Verrastro* v. *Sivertsen*, 188 Conn. 213, 220–21, 448 A.2d 1344 (1982).

The trial court found that the defendant violated the Improvement Act because he did not comply with con-

tract requirements prescribed by § 20-429.[6] Significantly, however, § 20-429 by its express terms applies only to "home improvement contracts." See General Statutes § 20-429 (a) (1) (A) ("[n]o *home improvement contract* shall be valid or enforceable against an owner unless" (emphasis added)). Section 20-419 (5) defines a home improvement contract as "an agreement between a contractor and an owner for the performance of a home improvement." The defendant argues that the work he performed did not constitute a "home improvement" for purposes of § 20-419 (4) but, rather, involved the construction of a new home, which is explicitly exempt from Improvement Act applicability.

Our starting point is the broad language of § 20-419 (4), which sets forth the type of work that constitutes a home improvement. It provides the following: " 'Home improvement' includes, but is not limited to, the repair, replacement, remodeling, alteration, conversion, modernization, improvement, rehabilitation or sandblasting of, or addition to any land or building or that portion thereof which is used or designed to be used as a private residence, dwelling place or residential rental property . . . . 'Home improvement' does not include: (A) The construction of a new home . . . ." Significantly, § 20-419 (4) expressly excludes new home construction as constituting home improvement.

The defendant argues, among other things, that his work for the plaintiff does not fall within any of the types of work included within the definition of home improvement and, in fact, falls within the explicit new home construction exemption. In particular, he contends that new home construction is not confined to the physical building itself but can apply to site work that accompanies the building of the new home. The plaintiff, on the other hand, argues that the defendant's work was "home improvement" under § 20-419 (4) because the statute's list of work that constitutes "home improvement" is not exhaustive and the land on which the defendant performed work was, at the very least, "designed to be used as a private residence." Thus, the plaintiff contends that "the [Improvement Act], by its very words, contemplates improvement to land, regardless of whether or not there is a building thereupon." A critical determination for our analysis is whether the defendant's conduct falls into the new home construction exception, thereby rendering the Improvement Act inapplicable. If so, there is no further need to determine whether the conduct falls within the nonexhaustive list of work that does constitute home improvement.

Although new home construction is not defined within the Improvement Act, our Supreme Court previously has held that determining whether work constitutes new home construction is dependent on whether the particular work and the construction of the home "were so interrelated, temporally or otherwise, that the

[work] constituted an integral part of the construction of a new home . . . ." (Internal quotation marks omitted.) *Rizzo Pool Co.* v. *Del Grosso*, 232 Conn. 666, 678, 657 A.2d 1087 (1995) (*Rizzo*). In determining whether construction work is sufficiently connected to new home construction, this court has considered whether the services furthered the goal of completing the home and whether they were required to make the home habitable. See *Laser Contracting, LLC* v. *Torrance Family Ltd. Partnership*, 108 Conn. App. 222, 227–29, 947 A.2d 989 (2008).

Relying primarily on *Rizzo* and also citing to *Drain Doctor, Inc.* v. *Lyman*, 115 Conn. App. 457, 973 A.2d 672 (2009), the trial court determined that the defendant's work, which "related to the groundwork and landscaping of the house," was separate and distinct from the new home construction, thereby constituting home improvement and implicating the [Improvement Act]. The cases cited by the trial court, however, are factually distinguishable from the present case for the reasons that follow.

In *Drain Doctor, Inc.*, the defendant homeowner contracted with the plaintiff corporation to *fix* a broken sewer line at his home. *Drain Doctor, Inc.* v. *Lyman*, supra, 115 Conn. App. 459. The nature of the construction work involved the plaintiff's repair to an existing component of a home that had already been built. This is in direct contrast to the present matter where no septic system had existed at the time the defendant began performing his contractual duties.

In *Rizzo*, the defendants, while their new home was under construction, signed a contract with the plaintiff to install a swimming pool at the new home. *Rizzo*, supra, 232 Conn. 669. "Although the defendants anticipated that the pool would be installed prior to the completion date of their new home, the contract did not contain either a starting date or a completion date." Id. After a dispute regarding when to begin construction of the pool ensued, the plaintiff initiated an action for breach of contract. Id., 670. The trial court precluded the defendants from asserting a special defense under the Improvement Act, holding that the Improvement Act was inapplicable to the contract because the construction of the pool was part of the construction of a new home. Id., 672–73.

On appeal in *Rizzo*, our Supreme Court concluded that the pool installation was not part of the construction of the new home. In particular, it held that the "pool installation contract was completely separate and distinct from the defendants' home construction contract . . . . Moreover, the documents that comprise the contract for the construction of the swimming pool contain no indication that the pool was to have been installed at any particular stage of the new home construction, or even that it was to have been installed

prior to the completion of the new home. In fact, the contract documents make no reference whatsoever to the construction of the defendants' new home." (Footnote omitted.) Id., 677–78. Concluding that the pool installation and the new home construction were not "so interrelated, temporally or otherwise, that the installation of the pool constituted an integral part of [t]he construction of a new home under § 20-419 (4) (A)," the court held that the Improvement Act was applicable to parties' contract. (Internal quotation marks omitted.) Id., 678.

Key differences exist in the circumstances surrounding the contract between the parties in *Rizzo* and those in the present case. First, unlike the contract in *Rizzo*, which was entirely independent from the new home construction contract and did not make reference to the construction of the new residence, the contract between the plaintiff and the defendant in the present case required the defendant to perform various projects originally set forth in the GH contract and, thus, the contract was linked directly to the new home construction contract. Furthermore, unlike in *Rizzo*, the contract in the present case specified that the defendant was to complete his work within one year of its signing. The fact that the construction of the home was completed in December, 2013, a little more than one year from the date the defendant signed the contract, September, 2012, temporally links the defendant's work to the completion of the home and bolsters the argument that it was sufficiently " 'interrelated, temporally or otherwise' " with the home construction. See id., 678.

The most significant consideration, in our view—and the one that most starkly distinguishes *Rizzo* from the present matter—is the nature of the construction work itself, namely, its relationship to the habitability of the home. In *Rizzo*, the dispute centered around the installation of a pool. In addition to being physically detached from the home, the pool itself served only an ancillary function and was not significantly related to the habitability of the home. By contrast, the work the defendant contracted to perform in the present matter—in particular, hammering out the ledge so that the foundation could be poured, digging the septic trench for the septic system, building retaining walls, and installing the septic tank, among others—directly contributed to the overall function and habitability of the home.

In *Laser Contracting, LLC* v. *Torrance Family Ltd. Partnership*, supra, 108 Conn. App. 227–29, this court directly addressed this consideration by holding that if the contracted services contribute to making a new home habitable that otherwise would be uninhabitable without such services, the work falls within the new home construction exception to the Improvement Act. The principal issue in *Laser Contracting, LLC*, was whether installing a modular home[7] at a new site and

in making improvements to the newly installed home were services that fell within the ambit of the Improvement Act's new home construction exception, thus rendering the Improvement Act's requirements inapplicable to the contract in that case. Id., 227. In that case, this court agreed with the trial court's conclusion that "the modular house was uninhabitable and in need of electrical, plumbing and heating services. A new basement, septic system, well, garage and driveway were constructed where none previously had existed. In sum, the project involved the construction of a new home . . . ." Id., 227–28.

Furthermore, in *Laser Contracting, LLC*, this court held that even the specific "repairs, alterations and upgrades" to the modular home qualified as new home construction under the criteria employed by our Supreme Court in *Rizzo*. Id., 228–29. This court noted that in *Rizzo*, "the pool installation contract involved services that were physically separate and distinct from the new home construction, and performed by separate unrelated contractors. . . . In addition, the pool contract contained no indication that the pool was to be installed at any particular stage of the new home construction or even that it was to have been installed prior to the completion of the new home. . . . By contrast, the record in [*Laser Contracting, LLC*] shows that the plaintiff's services . . . were not separate and distinct from the underlying project of reassembling and preparing a modular home for resale at a new location. . . . Unlike the situation in [*Rizzo*], then, not only was the contractor always the same entity, but the services it performed consistently served the parties' common goal of completing the house for resale." Id.

Having employed the analysis set forth in *Rizzo* and *Laser Contracting, LLC*, we conclude that the defendant's services for the plaintiff were part and parcel of the construction of the plaintiff's new home. Although there was more than one contractor involved in the construction work here, the defendant's work was originally contemplated as part of the GH contract to construct a new residence and took place simultaneously with Golden Hammer's construction of the new home. The tasks performed were sufficiently interrelated to the new home construction so as to fall within the new home construction exception of the Improvement Act.

The inapplicability of the Improvement Act to the parties' contract in this case is also supported by other definitions within that act, particularly the definition of "owner" as it applies to a home improvement contract. Section 20-419 (6) defines an owner as "a person who owns or resides in a private residence and includes any agent thereof, including, but not limited to, a condominium association. . . ." "'Private residence' " is defined as "a single family dwelling . . . ." General Statutes § 20-419 (8). These definitions, read in conjunction with

the previously examined case law, bolster the conclusion that work performed in relation to the construction of a home not yet in existence constitutes new home construction, which is exempt from the Improvement Act. Although § 20-419 (6) explicitly provides that an individual need not reside in the private residence in order to qualify as an owner, it is axiomatic that there needs to be a dwelling within which the individual *could* reside for it to be considered a private residence such that it invokes the plaintiff's status as an "owner."

The plaintiff's argument that "home improvement" includes work performed on the land, regardless of whether there is an existing building, would render the very clause providing for an exception to new home construction meaningless. Under the plaintiff's logic, all site work related to new home construction would always constitute "home improvement" and, thus, fall within the purview of the Improvement Act. It further would render the definition of "private residence" meaningless, if no dwelling needs to exist for work to constitute home improvement. If different interpretations of a statute are possible, we must adopt the one that creates workable results and does not render any words or phrases meaningless. See *Verrastro* v. *Sivertsen*, supra, 188 Conn. 220–21. In the present matter, the defendant's proposed interpretation of "home improvement" creates workable results and is supported by our case law; on the contrary, the plaintiff's proposed interpretation creates unworkable results.

In light of the foregoing, we conclude that the work performed by the defendant was a part of new home construction and, thus, falls within the statutory exception contained in § 20-419 (4). As such, the defendant's services were not "home improvements" pursuant to § 20-419 (5). Because no home improvement contract existed, the defendant could not have violated the Improvement Act.[8] Because the sole basis for the defendant's CUTPA liability was his alleged Improvement Act violation, we reverse the court's judgment finding the defendant liable for violating CUTPA.[9]

B

The defendant also claims that the court abused its discretion by awarding attorney's fees to the plaintiff. Specifically, he argues that no attorney's fees should have been awarded because (1) the contract he allegedly breached did not provide for the recovery of attorney's fees and (2) he did not violate CUTPA, which permits recovery of attorney's fees only on a finding that CUTPA liability exists.[10]

In contrast, the plaintiff argues that the court did not abuse its discretion in awarding attorney's fees not only on the CUTPA claim but also with respect to the breach of contract claim. He contends that because the two claims are inextricably related, it would have been

impracticable to segregate and apportion the fees. We agree with the defendant that the court improperly awarded attorney's fees to the plaintiff.

Before addressing this claim, we first set forth the relevant legal principles concerning a court's award of attorney's fees for breach of contract and CUTPA claims. "[U]nder the American rule,[11] the plaintiff ordinarily cannot recover attorney's fees for breach of contract in the absence of an express provision allowing recovery . . . ." (Footnote in original.) *Aurora Loan Services, LLC* v. *Hirsch*, 170 Conn. App. 439, 453, 154 A.3d 1009 (2017). In the present matter, the contract between the plaintiff and the defendant did not expressly authorize the nonbreaching party to recover attorney's fees. Accordingly, the plaintiff may not recover attorney's fees for his breach of contract claim.

CUTPA, however, specifically allows the court to award legal fees associated with an action brought pursuant to the act. Specifically, § 42-110g (d) provides in relevant part: "In any action brought by a person under this section, the court may award, to the plaintiff, in addition to the relief provided in this section, costs and reasonable attorneys' fees based on the work reasonably performed by an attorney and not on the amount of recovery. . . ."

Turning to the present case, the trial court, regarding attorney's fees, stated in its memorandum of decision: "Having found a violation of CUTPA here, the court found the plaintiff was entitled to recover attorney's fees and costs." It further concluded that "the plaintiff should be awarded his fees for establishing his breach of contract claims . . . ."

Given our conclusion that the defendant did not violate CUTPA, there is no basis for the plaintiff's recovery of any attorney's fees in the present case. Having reversed the court's judgment on the CUTPA count, and without any contractual provision on which properly to base an award of attorney's fees, we accordingly reverse the court's judgment awarding the plaintiff $126,126.91 in attorney's fees and $2412.05 in costs in connection with the CUTPA violation.

II

Lastly, the defendant claims that the court improperly rendered judgment in favor of the plaintiff on his breach of contract claim. In particular, the defendant argues that the court's finding that his breach of contract caused the plaintiff's damages was clearly erroneous. We disagree and, accordingly, affirm the court's judgment on the plaintiff's breach of contract claim.

As a preliminary matter, the plaintiff contends that the defendant has not adequately challenged the court's judgment as to the breach of contract count but, instead, "only appears to [attack] the findings on [a] cursory level." The defendant responds that, although he did

not expressly label them as such, his general arguments that the court's determinations were based on speculation and insufficient evidence sufficiently challenge the court's findings with respect to causation as it relates to the breach of contract count. Even if we assume for purposes of argument that the defendant had adequately briefed his challenge to the court's finding of causation, we still conclude that he is not entitled to relief on this claim.

We begin by setting forth the standard of review and legal principles relevant to this claim. "It is well established that [t]he elements of a breach of contract action are the formation of an agreement, performance by one party, breach of the agreement by the other party and damages. . . . Although this court has intimated that causation is an additional element thereof . . . proof of causation more properly is classified as part and parcel of a party's claim for breach of contract damages." (Citations omitted; internal quotation marks omitted.) *Meadowbrook Center, Inc.* v. *Buchman*, 149 Conn. App. 177, 186, 90 A.3d 219 (2014). "Under Connecticut law, the causation standard applicable to breach of contract actions asks not whether a defendant's conduct was a proximate cause of the plaintiff's injuries, but rather whether those injuries were foreseeable to the defendant and naturally and directly resulted from the defendant's conduct." *Theodore* v. *Lifeline Systems Co.*, 173 Conn. App. 291, 306 n.5, 163 A.3d 654 (2017).

"Causation [is] a question of fact for the [fact finder] to determine . . . and, thus, is governed by the clearly erroneous standard of review." (Citations omitted; internal quotation marks omitted.) *Meadowbrook Center, Inc.* v. *Buchman*, supra, 149 Conn. App. 193. Under this standard, "we overturn a finding of fact when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *Naples* v. *Keystone Building & Development Corp.*, 295 Conn. 214, 225, 990 A.2d 326 (2010).

Here, the court found that the plaintiff proved all elements of his breach of contract claim. On the issue of damages, the court stated in its memorandum of decision that "the plaintiff provided a detailed account of the damages he sustained due to the defendant's poor workmanship," finding that "[a]s a result [of] the defendant's improper work, the plaintiff paid $50,714.46 to finish the defendant's work and $60,508.86 for corrective work . . . ."

On appeal, the defendant argues that the court's finding of damages is clearly erroneous because the plaintiff never proved beyond speculation that the defendant's conduct caused damage to the plaintiff's property. He

contends that "[t]he intervening period of time between [his] conduct and the appearance of any defective condition, the lack of a definitely identified cause for the defective conditions, the fact that the plaintiff had work done after [he] left the job which was not necessary or that the plaintiff did not do work he should have done, and the several other potential causes of the defective conditions, ensured that any conclusion of causation was premised on mere speculation."

The defendant's arguments can be best characterized as an assertion that there were other possible causes for the plaintiff's damages. This contention, however, is inconsistent with the standard by which we must review the court's finding—it is not whether there are other conceivable causes but, rather, whether there was evidence to allow the court to find that the *defendant's conduct* was the cause. "Proof of a material fact . . . need not be so conclusive as to exclude every other hypothesis. It is sufficient if the evidence produces in the mind of the trier a reasonable belief in the probability of the existence of the material fact." *Rockhill* v. *Danbury Hospital*, 176 Conn. App. 39, 44, 168 A.3d 630 (2017).

The plaintiff, on the other hand, argues that there was adequate evidence to show that the defendant's work caused his damages, particularly in the form of testimony from multiple witnesses, including Charles Lindo. We agree.

Lindo served as a fact witness and as an expert witness[12] in the areas of site work, excavation, septic installation, and site preparation; he testified as to various problems that arose as a result of, among other things, the defendant's repeated use of rocks instead of sand as backfill.[13] Other witnesses who testified regarding problems with the defendant's backfilling included George Brennan, the town's fire marshal,[14] and Brett Sheldon, a representative from the gas company.[15] Lindo also testified to problems he saw related to the defendant's construction of the retaining walls, as well as the driveway.

"[I]t is the exclusive province of the trier of fact to weigh . . . conflicting evidence, determine the credibility of witnesses and determine whether to accept some, all or none of a witness' testimony." *Rockhill* v. *Danbury Hospital*, supra, 176 Conn. App. 44. The trial court, as the trier of fact, was free to credit the testimony of the plaintiff's witnesses in concluding that the defendant's conduct caused the damages suffered by the plaintiff. We conclude, therefore, that the court's findings were not clearly erroneous and there was evidence in the record to support the breach of contract judgment rendered in favor of the plaintiff.

The judgment is reversed as to counts three, four, and five, and as to the award of attorney's fees, and

the case is remanded with direction to render judgment in favor of the defendant on those counts; the judgment is affirmed in all other respects.

In this opinion the other judges concurred.

[1] The GH contract was organized into the following categories: plans and permits, excavation, foundation, exterior, windows and doors, garage doors, insulation, electrical, plumbing, heating/AC, drywall, roofing, cabinets and vanities, flooring, interior trim and doors, stairs, painting, other, landscaping, and interior cleaning.

[2] The contract required the defendant to "purchase and supply all supplies needed, clear the lot, remove stumps, dig the foundation hole and well trenches, purchase and install a septic tank, build a wall along the edge of the lakeside, build two retaining walls, build two driveways, reclaim asphalt for the driveway, grade the driveway at 8 percent, install footing drains and backfill foundation, finish the grade, seed the lawn, and conduct any blasting."

[3] In its memorandum of decision, the trial court listed numerous deficiencies in the defendant's performance. "First, the defendant did not properly backfill the foundation, using large rocks and boulders instead of dirt to support the foundation. . . . Additionally, the footing drains for the foundation were improperly installed, causing flooding in the basement of the house.

"Second, the defendant improperly installed the septic system because it was backfilled with rocks instead of sand and too close to the surface, making it more likely it could be crushed. That is exactly what happened in 2014, when the defendant crushed the top of the tank, requiring another tank to be installed in April, 2014. This tank too was deficient and required replacing because the line running from it to the house had a break in it. . . . The defendant admitted in his posttrial brief that he crushed the septic tank.

"Third, the defendant improperly constructed the retaining walls in the front and back of the house because they leaned, contained gaps, and washed out due to improper backfilling.

"Fourth, the defendant improperly installed the patio. . . . [H]is installation used rocks instead of sand as backfill, causing the patio to settle improperly.

* * *

"Sixth, the defendant improperly installed the propane tank. . . . [He] used rocks rather than sand as backfill for the tank and pipe, causing the propane to leak from the pipe and damaging the tank. After inspection, the entire tank and pipe were replaced.

"Seventh, the defendant improperly installed the well electrical line, using rocks instead of sand as backfill. Consequently, the electric line failed and needed replacement.

"Eighth, the defendant did not properly reclaim or grade the driveway. The driveway was at a grade higher than 8 percent, causing the plaintiff to regrade it. Further, the lower half of the driveway was not reclaimed with asphalt because it was left as dirt." (Footnote omitted.)

[4] We note the following procedural posture regarding count three of the plaintiff's complaint. As written, the count alleged: "The defendant's conduct is in violation of [§] 20-417a [et seq]." The court, however, never substantively addressed the New Home Act, instead, seeming to treat count three as alleging a violation of the Improvement Act, although the plaintiff had expressly alleged an Improvement Act violation in count four. This is clearly evidenced by the court's memorandum of decision, wherein the court grouped the two counts together in its analysis of the Improvement Act, stating: "The plaintiff's third and fourth counts allege violations of the [Improvement Act] . . . ." After its analysis, the court concluded that the defendant violated the Improvement Act and stated: "The court finds for the plaintiff on counts three and four of his complaint."

The plaintiff has failed to challenge the court's decision to treat count three as pertaining to the Improvement Act rather than the New Home Act. The plaintiff's motion for reconsideration filed with the trial court did not raise this issue. The plaintiff also failed to raise this issue on appeal pursuant to Practice Book § 63-4 (a) (1) (B). Accordingly, we conclude that the plaintiff has abandoned any claim that the court improperly failed to consider separately an alleged violation of the New Home Act.

[5] We note that the defendant also claims that the trial court improperly rendered judgment in favor of the plaintiff on counts three and four of his

complaint because the Improvement Act does not authorize him to bring a private cause of action. No appellate court in this state has directly decided whether the Improvement Act authorizes an independent, private cause of action. In *Hees* v. *Burke Construction*, 290 Conn. 1, 961 A.2d 373 (2009), however, our Supreme Court discussed the scope of General Statutes § 20-429 (a). After reviewing the relevant legislative history of the statute, the Supreme Court concluded that the statute provides a homeowner with a shield from liability sought by a contractor if the contractor failed to comply with the Improvement Act. Id., 12–13. Additionally, "our Superior Court [has] uniformly determined that . . . § 20-429 is a defense and cannot be used as an independent cause of action for a homeowner against a contractor." (Internal quotation marks omitted.) *Huzi* v. *Anglace*, Superior Court, judicial district of Ansonia-Milford, Docket No. CV-06-5002246-S (October 13, 2009).

Here, the trial court expressly stated in its memorandum of decision that "the [Improvement Act] may not be used by a homeowner offensively against a contractor except where the homeowner asserts an affirmative CUTPA claim against the contractor." This language suggests to us that the court understood that the defendant's violations of the Improvement Act were material only to the extent that they served as a predicate for the defendant's liability under the CUTPA claim but cannot serve as an independent basis for the defendant's liability. In light of this conclusion, it is unclear why the court rendered judgment in favor of the plaintiff on counts three and four. In any event, because we conclude that the Improvement Act does not apply under the circumstances of this case and, thus, the court should not have rendered judgment in favor of the plaintiff on counts three, four, and five, we need not decide in this appeal whether the Improvement Act authorizes a freestanding private cause of action by a homeowner.

[6] Specifically, the court found that the contract did not "contain the name and address of the contractor and the contractor's registration number, did not contain a notice of the owner's cancellation rights, and did not disclose whether the defendant worked as a sole proprietor, and did not contain the entire agreement" as required by § 20-429 (a) (1) (A).

[7] "[A] modular home is largely manufactured somewhere away from the eventual home site and brought to the local home site for installation." (Internal quotation marks omitted.) *Brenmor Properties*, *LLC* v. *Planning & Zoning Commission*, 162 Conn. App. 678, 681 n.4, 136 A.3d 24 (2016), aff'd, 326 Conn. 55, 161 A.3d 545 (2017).

[8] The defendant also argues, alternatively, that, even if the Improvement Act were applicable, he is exempt due to his status as a licensed septic system installer pursuant to General Statutes § 20-428 and as a subcontractor. Because we conclude that the Improvement Act is inapplicable, we need not address these arguments.

[9] The defendant also argues that the plaintiff failed to satisfy the second CUTPA requirement of proving damages. He argues, among other things, that the type of conduct that the court found as the basis of his CUTPA violation was not within the purview of the Improvement Act and, therefore, damages awarded on that basis were improper. Having reversed the court's judgment on the CUTPA count on a different basis, we need not address the merits of the defendant's claim regarding damages.

[10] Alternatively, he claims that, even if there were a CUTPA violation, the court abused its discretion by awarding the plaintiff *all* of his attorney's fees instead of only those that he incurred in pursuing the CUTPA action. Because we conclude that the plaintiff is not entitled to any attorney's fees, we need not reach the issue of apportionment of such fees.

[11] "The general rule of law known as the American rule is that attorney's fees and ordinary expenses and burdens of litigation are not allowed to the successful party absent a contractual or statutory exception. . . . Connecticut adheres to the American rule. . . . There are few exceptions. For example, a specific contractual term may provide for the recovery of attorney's fees and costs . . . or a statute may confer such rights." (Internal quotation marks omitted.) *Aurora Loan Services*, *LLC* v. *Hirsch*, 170 Conn. App. 439, 453 n.9, 154 A.3d 1009 (2017).

[12] The defendant also argues that the court's finding of causation was clearly erroneous because the plaintiff failed to offer expert testimony to prove that the defendant's work caused the plaintiff's damages. We reject the premise of this contention because Lindo testified and offered expert opinion regarding a variety of issues involving the defendant's work based on his training, experience, and expertise in this area.

[13] Lindo testified in response to questioning by the plaintiff's counsel to the

following regarding the effect of using rocks as backfill on the septic system:

"Q.: And when you were digging do you recall the type of the material that was coming out of the trench?

"A.: Yeah. I mean, it was just rock. There was no— you know, usually you would dig down and hit a layer of sand and that's where you'd start hand shoveling, but it was all rocks. . . .

"Q.: And what's the purpose of putting sand in there instead of the fill that you discovered in there?

"A.: To protect the pipe from breaking.

"Q.: And is there a reason that a pipe might break if it's in material that's laden with rocks or—?

"A.: Yeah. I mean, a pipe's only so strong. You can't, you know, put a rock on it and then, you know, any kind of pressure on it whether it'd be settling, or you know . . . anything's [going to] break the pipe."

Lindo testified to the following regarding the effect of using rocks as backfill for the foundation:

"Q.: When you backfill footing—not footings, but foundations, what type of material are you supposed to use against the foundation properly?

"A.: Backfill on a foundation depends what's on site. You know, if you have bad material there, you try and bring in something decent to keep around the foundation wall.

"Q.: When you say bad material what are you talking about?

"A.: Big rocks, boulders, things like that. . . .

"Q.: Was there a lot of bad material on this site?

"A.: Yeah.

"Q.: And why do you try to avoid putting rocks and so forth up against the foundation?

"A.: A lot of reasons. You know, cracks in the wall, you know, if you keep a lot of —pull out a lot of big boulders in that area where you've dug, you're [going to] have the material shifting and settling, and you know, it could push on the wall itself."

[14] Brennan testified on direct examination by the plaintiff's counsel to the following regarding the proper material for backfilling:

"Q.: It shouldn't have rocks or other debris?

"A.: No, sir.

"Q.: And why is that?

"A.: Because in New England rocks move under the ground with the frost . . . and it will rub against the pipe eventually and cause it to either leak or—eventually it will leak."

[15] The following colloquy occurred during the plaintiff's counsel's direct examination of Sheldon:

"Q.: [I]s that something you would have expected in terms of the scratches to see if it had been backfilled with proper material?

"A.: That is not what would happen if that tank was backfilled properly.

"Q.: Okay. In looking at [an exhibit depicting large rocks], is that material that should have been used to backfill?

"A.: No. Absolutely not.

"Q.: [C]ould you tell the court—or if you know why the water might back up into the regulator box?

"A.: The regulator would have backed up because the water had nowhere to flow out because as the fire marshal had stated, the clay that was found around [the] tank would have kept the water in there and not allowed it [to] have gone through like it would have if sand was around the tank. That water would have drained out through the sand."

---